UNITED STATES *v.* JAMES ᴇᴛ ᴀʟ.

No. 85–434.　Argued April 21, 1986—Decided July 2, 1986

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which MARSHALL and O'CONNOR, JJ., joined, *post*, p. 612.

*Andrew J. Pincus* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard*, and *Deputy Solicitor General Geller.*

*T. John Ward* argued the cause for respondents. With him on the brief for respondents James et al. were *Peter E. Scheer* and *Joseph N. Onek. Sam J. D'Amico* and *J. Michael McDonald* filed a brief for respondent Clardy.

JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether the Flood Control Act's immunity provision in 33 U. S. C. § 702c, which states

that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place," bars recovery where the Federal Government would otherwise be liable under the Federal Tort Claims Act, 28 U. S. C. § 2671 *et seq.*, for personal injury caused by the Federal Government's negligent failure to warn of the dangers from the release of floodwaters from federal flood control projects.

## I

The present case arose from serious accidents at flood control projects in Arkansas and Louisiana. In both accidents, recreational users of the reservoirs were swept through retaining structures when those structures were opened to release waters in order to control flooding.

## A

The project in Arkansas, Millwood Dam, was dedicated in 1966 and is located in the southwestern corner of the State. The Millwood Reservoir behind the structure is used for fishing, swimming, boating, and waterskiing. This reservoir has marinas and launching areas for small boats. The United States Government Printing Office has printed brochures that promote the recreational features of the project and encourage the public to water-ski at the Millwood Reservoir.

Enormous underwater portals set within the Millwood Dam, called "tainter gates," allow the discharge of water from the Reservoir into a spilling basin below. On June 8, 1979, the level of the Reservoir was such that the United States Corps of Engineers designated it at "flood stage." As part of the flood control function of the Millwood facility, the Corps of Engineers began to release water through the tainter gates. This release created a swift, strong current toward the underwater discharge.

Respondents Charlotte James and Kathy Butler, who were water-skiing in that area because the water appeared to be calm, fell and began drifting toward the tainter gates. Re-

spondents' husbands, who were operating the ski boat, circled back to give them the towlines, apparently intending to pull them away from danger. Tr. 20–21, 166–167. Because of the swift currents, respondents were unable to hold on to the lines. *Ibid.* The husbands' attempts to pull respondents aboard by hand also failed because each time the current pulled the skiers out of reach. *Id.*, at 21. Eddy Butler then dove into the water in an attempt to save his wife, but all three were pulled through the tainter gates. He drowned, and respondents James and Butler were injured. The boat, still occupied by Mr. James and his daughter Sonja, became lodged in the tainter gates, and the occupants were rescued without injury.

Respondents James and Butler filed suit in the United States District Court for the Eastern District of Texas against the United States under the Federal Tort Claims Act, 28 U. S. C. §§ 1346(b), 2671 *et seq.* After a bench trial, the court in an unreported opinion found that a cable strung with orange buoys delineating the area of danger near the tainter gates had broken and drifted away; that white anchor buoys marking a restricted area near the dam were also out of place and consequently offered no warning to a reasonably prudent user; that the United States "knew that the dangerous condition created would result in injury to those situated as [were respondents James and Butler] if an adequate warning was not given"; and that respondents James and Butler were not negligent. The court assessed damages at $1 million for respondent Butler, and $40,000 for respondent James, stating that the case went "beyond gross negligence" and "constitute[d] a classic classroom example of a death and injuries resulting from conscious governmental indifference to the safety of the public." App. to Pet. for Cert. 66a. At the same time, however, the court concluded that although Federal Government agents had willfully and even maliciously failed to warn of a known danger, the Federal Government was immune from damages under 33 U. S. C. § 702c, a statute left unre-

pealed by the Federal Tort Claims Act. See 60 Stat. 842, 846–847 (listing statutes specifically revoked by FTCA). The court accordingly denied relief.

## B

The relevant flood control project in Louisiana, the Courtableau Drainage Structure, is located near the West Atchafalaya Basin. On May 17, 1980, the waters in the reservoir of Bayou Courtableau Basin were at flood stage, and consequently the Corps of Engineers opened the gates in the project. This created a strong current. Kenneth Clardy and his father, Joseph Clardy, were fishing in the Basin. Only two faded signs at the entrance of the drainage structure warned of the dangerous current. The boaters could not see the signs until they already had been swept past them. The boat became disabled and was drawn through the open gates of the spillway. Kenneth Clardy was thrown into the approach basin and drowned while being pulled through a 220-foot-long barrel of the drainage structure.[1] His father survived without injury.

Respondent Susan Clardy, Kenneth Clardy's wife, commenced an action in the United States District Court for the Western District of Louisiana seeking damages under the Federal Tort Claims Act, alleging that the Corps of Engineers failed to post adequate warnings of the danger from the current caused by the open gates. The Federal Government conceded that it negligently failed to warn the decedent. The District Court found, however, that under *Graci* v. *United States*, 456 F. 2d 20 (CA5 1971), and *Florida East Coast R. Co.* v. *United States*, 519 F. 2d 1184 (CA5 1975),[2]

---

[1] The District Court incorrectly identified Joseph Clardy as the decedent. App. to Pet. for Cert. 60a–61a.

[2] In *Graci* v. *United States* property owners in Louisiana brought suit for flooding allegedly caused by negligent design in the Mississippi River Gulf Channel Outlet, a navigation project that provides a shortcut from the Gulf of Mexico to New Orleans. The Federal Government contended that § 702c granted immunity from damages caused by any floodwaters, even those unconnected with flood control projects. The court rejected this ar-

the United States was immune under § 702c from damages for personal injury caused by floods or floodwaters in the negligent operation of flood control projects. The court found further that the Federal Government's action was within the scope of § 702c because "the gates were opened to *prevent* flooding and inundation landside of the drainage structure." App. to Pet. for Cert. 62a. The court accordingly granted summary judgment for the United States.

## C

The Court of Appeals for the Fifth Circuit consolidated the cases on appeal, and a panel affirmed. 740 F. 2d 365 (1984). Although the panel believed that the legislative history of § 702c showed that Congress intended the provision to disclaim only "liability for 'takings' and not liability for consequential damages," *id.*, at 373, the panel affirmed both judgments from the District Courts because of the Circuit's earlier interpretation of the section in *Graci, supra,* and *Florida East Coast R. Co., supra.* See n. 2, *supra.*

The Court of Appeals reheard the case en banc and reversed the District Courts' judgments. 760 F. 2d 590 (1985). The court determined that § 702c contained "latent ambiguities" that could be resolved only by reference to the legislative history. *Id.*, at 594. Analyzing that history, the court stated that in enacting § 702c as part of the Flood Control Act of 1928, "Congress was concerned with allocating the costs of a major public works program between the federal government and the state and local interests, both public and pri-

gument, and held that the provision conferred immunity only for floods or floodwaters connected with a flood control project.

In *Florida East Coast R. Co.* v. *United States* the court denied recovery to a railroad after its tracks near a central Florida flood control project were washed out by heavy rains. The court rejected arguments that the immunity provision did not cover losses caused or aggravated by the Federal Government's own negligence, and that "washouts" caused by the rapid runoff of surface water were not "flood" damage.

vate, in the wake of a financial, administrative, and engineering debacle [from the great Mississippi River flood of 1927]." *Id.*, at 596. Departing from the panel's reading of § 702c's legislative history, the en banc court concluded that Congress intended § 702c to immunize the Federal Government from liability for damage resulting directly from construction of flood control projects and from liability for flooding caused by factors beyond the Government's control, but that Congress had not intended "to shield the negligent or wrongful acts of government employees—either in the construction or in the continued operation" of flood control projects, including the failure "to warn the public of the existence of hazards to their accepted use of government-impounded water, or nearby land." *Id.*, at 599, 603.

Judge Gee, joined by four other judges in dissent, argued that the holding was contrary to "the statute's plain words," *id.*, at 604, and that "[b]oth the language of § 702c and the legislative history [are] entirely consistent with a purpose in the Congress, poised over a half-century ago on the brink of entry into a massive public works program—one of then unprecedented scope and laden with foreseeable and unforeseeable prospects of liability—to state clearly that the federal treasury was to be placed at risk by it no further than was required by the Constitution," *id.*, at 605–606. He noted that this construction was the unanimous view of previous Courts of Appeals that had construed § 702c, and that it "has stood for three decades without any sign of Congressional dissatisfaction." *Id.*, at 606.[3]

We granted certiorari to resolve the resultant split among the Circuits.[4] 474 U. S. 978 (1985). We now reverse.

---

[3] Judge Higginbotham filed a separate dissenting opinion stating that "[w]ithout clear evidence of what Congress meant to do in 1928, I would defer to the longstanding and unanimous construction placed on § 702c by this and other courts . . . ." 760 F. 2d, at 606–607.

[4] All other Courts of Appeals that have interpreted § 702c—and, prior to this case, the Court of Appeals for the Fifth Circuit, see n. 2, *supra*—have

## II

The starting point in statutory interpretation is "the language [of the statute] itself." *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring). "[W]e assume that the legislative purpose is expressed by the ordinary meaning of the words used." *American Tobacco Co.* v. *Patterson,* 456 U. S. 63, 68 (1982). The immunity provision in § 702c, enacted as part of the Flood Control Act of 1928, 45 Stat. 534, 33 U. S. C. § 701 *et seq.,* outlines immunity in sweeping terms: "No liability of *any* kind shall attach to or rest upon the United States for *any* damage from or by floods or flood waters at *any* place." (Emphasis added.) It is difficult to imagine broader language.[5]

On its face, this language covers the accidents here. Respondents' injuries occurred as a result of the release of waters from reservoirs that had reached flood stage. Given the nature of the accidents at issue, and given the plain terms of the statute, "it requires some ingenuity to create ambiguity." *Rothschild* v. *United States,* 179 U. S. 463, 465 (1900).

held that § 702c grants immunity to the Federal Government from damages caused by floodwaters from a flood control project. See, *e. g., Portis* v. *Folk Construction Co.,* 694 F. 2d 520, 522 (CA8 1982) (purpose of § 702c is "to assure the government of absolute immunity for [damages caused by flooding related to] flood control projects"); *Morici Corp.* v. *United States,* 681 F. 2d 645, 647–648 (CA9 1982) ("[I]f [the plaintiff's] injury resulted from the operation of [a] federal project for flood control purposes, government immunity is complete"); *Callaway* v. *United States,* 568 F. 2d 684, 686–687 (CA10 1978) (rejecting arguments that § 702c does not apply to flood damages resulting from the operation of a flood control project in view of "broad and emphatic language of § 702c"); *Parks* v. *United States,* 370 F. 2d 92, 93 (CA2 1966) (same).

[5] As the principal dissent noted, any effort to devise a provision that more plainly rules out liability "serves small purpose beyond making the enactment read like an insurance company's form [of] general release rather than a statute." 760 F. 2d, at 604. Respondents conceded as much at oral argument: "I don't believe that [§ 702c] could have been more expansive ['in its absolute terms']." Tr. of Oral Arg. 30.

Cf. *TVA* v. *Hill*, 437 U. S. 153, 173, n. 18 (1978) (assertions of ambiguity do not transform a clear statute into an ambiguous provision).

Although the Court of Appeals found, for example, that the word "damage" was ambiguous because it might refer only to damage to property and exclude damage to persons, 760 F. 2d, at 594, and n. 7, the ordinary meaning of the word carries no such limitation. Damages "have historically been awarded both for injury to property and injury to the person—a fact too well-known to have been overlooked by the Congress . . . ." *American Stevedores, Inc.* v. *Porello*, 330 U. S. 446, 450 (1947).[6] Moreover, Congress' choice of the language "*any* damage" and "liability of *any* kind" further undercuts a narrow construction. (Emphasis added.)

Nor do the terms "flood" and "flood waters" create any uncertainty in the context of accidents such as the ones at issue in these cases. The Act concerns flood control projects designed to carry floodwaters. It is thus clear from § 702c's plain language that the terms "flood" and "flood waters" apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control. As both District Courts found, the waters here clearly fall within the ambit of the statute.[7]

---

[6] Damages means "loss due to . . . injury or harm to person, property, or reputation." Webster's Third New International Dictionary 571 (1961); Black's Law Dictionary 351 (5th ed. 1979). Damages carried the same meaning at the time § 702c was enacted. See 4 J. Sutherland, Law of Damages §§ 1241–1252 (4th ed. 1916); 2 T. Sedgwick, Measure of Damages §§ 573–574a (9th ed. 1912).

[7] See *Morici Corp.* v. *United States, supra,* at 647–648 (no immunity for flooding if inundation " 'wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization' "), quoting *Peterson* v. *United States,* 367 F. 2d 271 (CA9 1966); *Hayes* v. *United States,* 585 F. 2d 701, 702–703 (CA4 1978) ("If the plaintiff could prove damage to his farm as a result of the dam's operation as a recreational facility *without relation to the opera-*

## III

We have repeatedly recognized that "[w]hen . . . the terms of a statute [are] unambiguous, judicial inquiry is complete, except 'in "rare and exceptional circumstances." ' " *Rubin* v. *United States*, 449 U. S. 424, 430 (1981) (citations omitted). In the absence of a "clearly expressed legislative intention to the contrary," the language of the statute itself "must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980). Despite respondents' contentions and the reasoning of the Court of Appeals, we do not find that the legislative history of the statute justifies departure from the plain words of the statute. Indeed, on balance we think the legislative history of the Flood Control Act of 1928 *reinforces* the plain language of the immunity provision in § 702c.

The Flood Control Act enacted "a comprehensive ten-year program for the entire [Mississippi River] valley, embodying a general bank protection scheme, channel stabilization and river regulation, all involving vast expenditures of public funds." *United States* v. *Sponenbarger*, 308 U. S. 256, 262 (1939). The Act was the Nation's response to the disastrous flood in the Mississippi River Valley in 1927. That flood resulted in the loss of nearly 200 lives and more than $200 million in property damage; almost 700,000 people were left homeless. S. Rep. No. 619, 70th Cong., 1st Sess., 12 (1928). The flood control system in the Mississippi River Valley in response to this catastrophe was the largest public works project undertaken up to that time in the United States.[8]

---

*tion of the dam as a flood control project,* he would avoid the absolute bar of § 702c" (emphasis added)).

We have noted that here the District Court in each case found that the waters were being released from federal flood control facilities to prevent flooding. App. to Pet. for Cert. 61a, 68a. The Court of Appeals upheld these findings, 760 F. 2d, at 603, and assumed that "the waters in this [consolidated] case were floodwaters." *Id.*, at 594, n. 6.

[8] Representative Snell, Chairman of the House Rules Committee, stated in reporting the rules on debate for the Flood Control Act of 1928:

It is not surprising, in the light of the devastation wrought by the 1927 flood and the magnitude of Congress' undertaking, that the legislative history of § 702c shows a consistent concern for limiting the Federal Government's financial liability to expenditures directly necessary for the construction and operation of the various projects. Numerous statements concerning the immunity provision confirm that it was intended to reaffirm sovereign immunity in such a dangerous and extensive project. The Chairman of the House Rules Committee, in opening the discussion on the rule governing debate on the 1928 Act, stated:

> "I want this bill so drafted that it will contain all the safeguards necessary for the Federal Government. If we go down there and furnish protection to these people—and I assume it is a national responsibility—I do not want to have anything left out of the bill that would protect us now and for all time to come. I for one do not want to open up a situation that will cause thousands of lawsuits for damages against the Federal Government in the next 10, 20, or 50 years." 69 Cong. Rec. 6641 (1928) (remarks of Rep. Snell).

A number of other Congressmen unequivocally stated that the United States should not be liable for any expense other than the direct cost of constructing the project. See *id.,* at

---

"[T]he legislation made in order under this rule is the most important matter that has been brought before this House since the declaration of war about 11 years ago. This legislation provides for the most gigantic undertaking in construction and engineering that any government in the civilized world has ever undertaken. . . . [I]t is much larger and will cost four times as much as the Panama Canal." 69 Cong. Rec. 6640 (1928).

The statute authorized $325 million for the program, Act of May 15, 1928, ch. 569, § 1, 45 Stat. 534–535, but estimates of the cost of the entire project ranged past $500 million. H. R. Rep. No. 1100, 70th Cong., 1st Sess., 18 (1928).

7028 (remarks of Rep. Spearing); *id.*, at 6999–7000 (remarks of Rep. Frear).[9]

These statements show that the sweeping language of § 702c was no drafting inadvertence. See *National Mfg. Co. v. United States*, 210 F. 2d 263, 270 (CA8), cert. denied, 347 U. S. 967 (1954). Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the Government from "any" liability associated with flood control. As the Court of Appeals for the Eighth Circuit explained three decades ago in *National Mfg.*, § 702c's language "safeguarded the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language." 210 F. 2d, at 270. The equally broad and emphatic language found in the legislative history shows that Congress understood what it was saying. We therefore conclude that the legislative history fully supports attributing to the unambiguous words of the statute their ordinary meaning.

## IV

### A

Respondents nevertheless advance several alternative readings of § 702c's seemingly clear language.

Respondents Butler and James argue that the immunity provision of § 702c was enacted as a potential bar to claims against the Government for damages to property that do not rise to the level of a constitutional taking. The provision, according to this argument, thereby assured the Federal Government control over paying for property rights that it

---

[9] Respondents have argued that Congress would not have enacted § 702c if it were merely a codification of the Federal Government's sovereign immunity. The legislative history refutes this contention. One of the principal Congressmen in the debates concerning the immunity provision in § 702c remarked: "While it is wise to insert that provision in the bill, it is not necessary, because the Supreme Court of the United States has decided . . . that the Government is not liable for any of these damages." 69 Cong. Rec. 7028 (1928) (remarks of Rep. Spearing).

acquired under the proviso of § 702c (authorizing purchase of interests in certain properties bordering the Mississippi River) or under § 702d (authorizing purchase of "flowage rights"). Such a reading, it is contended, would still allow recovery for damages to persons or property not connected with these acquisitions.

We do not agree. Both § 702d and the proviso of § 702c provide for compensation by the Federal Government for the acquisition of certain kinds of property rights. We cannot see why Congress would first determine that these property rights deserved compensation, and then in the same statute give the Federal Government absolute discretion to decide whether to pay that compensation. Moreover, there is little in the legislative history to support the proposition that the immunity provision in § 702c was intended to bar only liability for the compensation described in the proviso and § 702d. Section 702c's immunity provision and proviso were introduced by different sponsors. 69 Cong. Rec. 7023 (1928). Congress unanimously accepted the immunity provision, but enacted the proviso only after debate and by a vote of 111–79. *Ibid.* The debates on the proviso, which addressed the narrow issue of whether compensation should be provided to property owners affected by the construction of levees on the opposite bank of the river, see *id.*, at 6642, contain no reference to the immunity provision, see *id.*, at 6642, 7022–7023. Similarly, the debate on § 702d does not reveal any relationship between that section and the immunity provision in § 702c. *Id.*, at 7104–7111. Finally, and most importantly, the proffered interpretation of § 702c ignores the broad language of the statute. If Congress had wished to bar actions for compensation for purchases under § 702c's proviso and § 702d, presumably it would have done so more specifically.

Respondents Butler and James also argue, in the alternative, that even if § 702c is intended to grant immunity in connection with flood control projects, the Federal Government is not entitled to immunity here because their injuries arose

from Government employees' alleged mismanagement of recreational activities wholly unrelated to flood control. In support of this argument they point to a "fundamental principle of immunity" that the "sphere or protected activity must be narrowly limited by the purpose for which the immunity was granted." We think, however, that the manner in which to convey warnings, including the negligent failure to do so, is part of the "management" of a flood control project. And as noted in n. 7, *supra*, the Court of Appeals found that the release of the waters at the Millwood Reservoir and at the Courtableau Basin was clearly related to flood control. Moreover, contrary to respondents' argument of "narrowly limited" immunity, the broad principle applicable here is that a "clear relinquishment of sovereign immunity [is required] to give justification for tort actions." *Dalehite* v. *United States*, 346 U. S. 15, 31 (1953).[10]

## B

Respondent Clardy adopts the en banc Court of Appeals' reading of § 702c: Congress enacted the section to immunize the Federal Government from liability *only* for property damage resulting directly from construction of flood control projects.

To support this argument, both respondent Clardy and the Court of Appeals rely on the portion of the legislative history of § 702c that concerns the Government's acquisition of prop-

[10] The cases on which respondents Butler and James rely relate to personal immunity, not to the Federal Government's sovereign immunity. See Brief for Respondent James et al. 33, citing, *inter alia, Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982); *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982); *Butz* v. *Economou*, 438 U. S. 478 (1978).

Respondents Butler and James have also argued that the immunity provision of § 702c applies only to projects authorized under the 1928 Act, and therefore does not extend to the Millwood Project. Section 702c is not by its terms restricted to projects constructed under the 1928 Act. Nor would it make sense for the Federal Government to have immunity only for some, but not all, of its flood control projects. We find no merit to this argument.

erty rights. According to the argument, the House of Representatives, where the provision originated, enacted § 702c solely in response to the Senate version of the Flood Control Act, which would have created broad remedies for property owners, offering "[j]ust compensation" for "all property used, taken, damaged, or destroyed in carrying out the flood control plan."[11] S. 3740, 70th Cong., 1st Sess., 54 (1928), 69 Cong. Rec. 5483 (1928). This language would have provided compensation well beyond the requirements of the Fifth Amendment's Takings Clause. It accordingly met with substantial hostility in the House, where Members feared it might "make the railroads" and other large property owners "a present of many millions of dollars." *Id.,* at 6712 (remarks of Rep. Kopp).

According to respondent Clardy, § 702c was added simply to counteract this generosity, and to prevent any excess costs for the acquisition of flowage rights or easements after the completion of the flood control project. Since none of the respondents' claims stem from property damage due to construction of a dam or reservoir, the argument goes, § 702c's immunity does not apply, and the Government may be held liable for its failure to warn the public of "the existence

---

[11] Section 702c, which consists of both the immunity provision at issue and a proviso, reads:

"No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: *Provided, however,* That if in carrying out the purposes of . . . this title it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of the Army and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands." (Emphasis in original.)

of hazards to their accepted use of government-impounded water or nearby land." 760 F. 2d, at 603.

We find no merit to this argument. It is true that during the debates on the Act, several Congressmen used the terms "liability" and "damage" to refer only to property damage caused by the construction of the flood control projects. But, as we have noted above, there are numerous passages in the legislative history that emphasize the intention of Congress to protect the Federal Government from *any* damages liability that might arise out of flood control. *Supra,* at 607–608. We think that the "fragments of legislative history" on which respondent Clardy and the Court of Appeals relied do not constitute "a clearly expressed legislative intent contrary to the plain language of the statute." *American Tobacco Co.* v. *Patterson,* 456 U. S., at 75.

V

As the facts in this case demonstrate, one can well understand why the Court of Appeals sought to find a principled way to hold the Government responsible for its concededly negligent conduct. But our role is to effectuate Congress' intent, and Congress rarely speaks more plainly than it has in the provision we apply here. If that provision is to be changed, it should be by Congress and not by this Court. We therefore follow the plain language of § 702c, a section of the 1928 Act that received careful consideration by Congress and that has remained unchanged for nearly 60 years, and hold that the Federal Government is immune from suit in this type of case. The judgment of the Court of Appeals for the Fifth Circuit is accordingly reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE MARSHALL and JUSTICE O'CONNOR join, dissenting.

As a part of the major undertaking authorized by the Mississippi Flood Control Act of 1928, Congress directed the Secretary of War and the Chief of Engineers to take special

steps to acquire lands that were subject to "overflow and damage" along the banks of the Mississippi River where it was impracticable to construct levees. In the section of the Act containing that specific direction concerning the acquisition of "lands so subjected to overflow and damage," there is a sentence stating that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."[1]

According to the Court, Congress intended by this sentence to immunize the Federal Government from liability for *any* claim for personal injury, even though Congress provided expressly for compensation for property damage in excess of

---

[1] Section 3 of the statute, which is now codified as 33 U. S. C. § 702c, reads in full as follows:

"Sec. 3. Except when authorized by the Secretary of War upon the recommendation of the Chief of Engineers, no money appropriated under authority of this Act shall be expended on the construction of any item of the project until the States or levee districts have given assurances satisfactory to the Secretary of War that they will (a) maintain all flood-control works after their completion, except controlling and regulating spillway structures, including special relief levees; maintenance includes normally such matters as cutting grass, removal of weeds, local drainage, and minor repairs of main river levees; (b) agree to accept land turned over to them under the provisions of section 4; (c) provide without cost to the United States, all rights of way for levee foundations and levees on the main stem of the Mississippi River between Cape Girardeau, Missouri, and the Head of Passes.

"No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: *Provided, however,* That if in carrying out the purposes of this Act it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands." 45 Stat. 535–536.

that required by the Constitution.[2]    In my view, neither the plain language of the statute nor the legislative history behind it supports imputing such a perverse design to the Legislature.    In my opinion, this provision applies only to property damage, and the judgment below should be affirmed.[3]

The immunity provision absolves the United States of liability for any "damage" by floods or floodwaters.    The word "damage" traditionally describes a harm to property (hence, "property damage"), rather than harm to the person (usually referred to as "personal injury").    As Chief Judge Cockburn explained in *Smith* v. *Brown*, 40 L. J. Rep. (n.s.) 214, 218 (Q. B. 1871):

> "The question is whether a personal injury occasioned by the collision of two vessels comes under the term 'damage' as used in the 7th section.    Now the words used are undoubtedly very extensive, but it is to be observed that neither in common parlance nor in legal phraseology is the word 'damage' used as applicable to injuries done to the person, but solely as applicable to mischief done to property.    Still less is this term applicable to loss of life or injury resulting therefrom, to a widow or surviving relative.    We speak indeed of 'damages' as compensation for injury done to the person, but the term 'damages' is not employed interchangeably with the term 'injury,' with reference to mischief wrongfully occasioned to the person. . . . [T]his distinction is not a matter of mere verbal criticism, but is of a substantial character and necessary to be attended to . . . ."

---

[2] Congress rejected an amendment to § 3 to provide only such compensation as would be required by the Constitution—a measure that Congress thought excluded flowage rights.    See 69 Cong. Rec. 7104–7111, 7122 (1928).

[3] My reading of the statute and its legislative history also persuades me that the immunity provision has no application to any other flood control project.

See *Seward* v. *The Owners of the Vera Cruz*, 54 L. J. Rep. 9, 13 (P. D. & A. 1884) (Lord Chancellor); *Simpson* v. *Blues*, 41 L. J. Rep. (n.s.) 121, 128 (C. P. 1872). This understanding of "damage" was not peculiar to English common-law courts, but was the preferred definition found in legal dictionaries and in legal encyclopedias in use in the United States around the time Congress drafted the Mississippi Flood Control Act. See, *e. g.*, Bouvier's Law Dictionary 749 (8th ed. 1914); 15 Am. Jur., Damages § 2, p. 388 (1938) ("A distinction is to be noted between the word 'damage' and 'damages.' 'Damage' is defined to be the loss, injury, or deterioration caused by negligence, design, or accident of one person to another *in respect of the latter's personal property*, whereas 'damages' signifies compensation in money for the loss or damage" (emphasis added)); 17 C. J., Damage 698 (1919) ("It has been held that neither in common parlance nor in legal phraseology is the word ['damage'] used as applicable to injuries done to the person, but solely as applicable to mischief done to property; and, although we speak of damages as compensation for injury done to the person, yet the term is not employed interchangeably with the term 'injury,' with reference to mischief wrongfully occasioned to the person; but there is authority to the effect that the term 'damage' includes personal injuries; and where the context shows that damage means personal injury, the term will be so construed" (footnotes omitted)).

Because the preferred definition of "damage" in 1928 excluded harm to the person, one would think that the Court — in accordance with the "plain meaning" of § 3—would construe the immunity provision to bar liability only for property damage. Surprisingly, the Court reaches precisely the opposite conclusion. Its analysis, however, relies entirely on authorities which define *"damages"*—or the monetary remedy imposed on one found liable for a legal wrong—rather than *"damage"*—which is the term Congress employed to identify the liability from which the Federal Government was thereafter excused. It is therefore quite beside the point

that "damages" have " 'historically been awarded both for injury to property and injury to the person.' " *Ante*, at 605 (quoting *American Stevedores, Inc.* v. *Porello*, 330 U. S. 446, 450 (1947)), for the statute bars liability for "damage," not "damages." Indeed, the Court's own authorities, see *ante*, at 605, and n. 6, distinguish between the two terms:

> "It might be noted here that there is a distinction between damage and damages. Black's Law Dictionary cautions that the word 'damage,' meaning 'Loss, injury, or deterioration,' is 'to be distinguished from its plural, — "damages,"—which means a compensation in money for a loss or damage.' " *American Stevedores, Inc.* v. *Porello*, 330 U. S., at 450, n. 6.[4]

The Court thus provides no basis for thinking that Congress used "damage" other than in its common, preferred usage to mean property damage. If "plain meaning" is our polestar, the immunity provision does not bar respondents' personal injury suits.

The remainder of the statute and its legislative history similarly provide no basis for assuming that Congress used "damage" to bar liability for personal injuries. The text of § 3—indeed, the text of the entire Mississippi Flood Control Act of 1928—contains no reference to personal injury. Moreover, when the sentence beginning "[n]o liability" is read together with the proviso appended to it, it is most

---

[4] The treatises on damages on which the Court relies likewise subscribe to this definition of "damages," see 1 T. Sedgwick, Measure of Damages § 29 (9th ed. 1912); 1 J. Sutherland, Law of Damages § 2, p. 4 (4th ed. 1916); *id.*, § 12, at 46, and the distinction between "damage" and "damages" appears to have been universally observed, see, *e. g.*, 15 Am. Jur., Damages § 2, p. 388 (1938); 8 American and English Encyclopaedia of Law 535 (2d ed. 1898); W. Hale, Law of Damages 9, 12–13 (2d ed. 1912). In fact, the authorities cited by the Court support the traditional interpretation of "damage"; for example, in the index to his treatise Mr. Sedgwick refers to "damage" only when referring to property damage. See 4 Sedgwick, *supra*, at 3160–3162.

readily understood as relating to the kind of harm that the paragraph as a whole describes—namely, the harm to "land subjected to overflow and damage." As the text of § 3 of the Act plainly states, see n. 1, *supra,* the Federal Government assumed certain responsibilities for areas in which the construction of levees was not practicable. Given that specific and limited undertaking, the sentence limiting liability is best understood as making it clear that the Federal Government accepted no additional responsibilities and did not intend to create a new federal judicial remedy for failing to carry out its undertaking. Indeed, a claim that the 1928 Act created a new federal remedy for property damage was advanced and rejected in *United States* v. *Sponenbarger,* 308 U. S. 256, 269–270 (1939). Thus, the text of § 3 read as a whole irresistibly implies that the sentence in question was intended merely to place a limit on the potential liability of the United States that might otherwise have arisen from the direction to the Secretary of the War and the Chief of Engineers concerning overflow damage to land.[5]

---

[5] The Court, see *ante,* at 609, is simply wrong in intimating that the immunity sentence and its proviso were dissociated from each other during their consideration before Congress. The Court's observation that the immunity provision and the proviso were sponsored by different Congressmen is only trivially true: the proviso was offered by Representative Garrett of Tennessee as an amendment to the immunity provision, which was itself a pending amendment, sponsored by Representative Reid of Illinois, to the bill before the House of Representatives. 69 Cong. Rec. 7022 (1928). The sponsor of the proviso, Representative Garrett, offered his amendment as an amendment to the immunity provision *before it was added to the bill. Ibid.* In explaining the reason for this, Representative Garrett underscored the symbiotic relationship between the immunity provision and the proviso:

"Mr. Chairman, I am inclined to agree with the gentleman from Illinois [Mr. MADDEN] that the amendment which the gentleman from Illinois [Mr. REID] has proposed more properly would come in another section, but if it is to come now it seems to me that my amendment will *have to*

The legislative history of the statute is entirely consistent with this reading. It was a response, not only to the disastrous flood of 1927, but to the perennial threat to landowners in the alluvial valley of the Mississippi River posed by recurrent floods since at least 1717. See *United States* v. *Sponenbarger*, 308 U. S., at 260–262. During the lengthy hearings and debates on the 1928 legislation, there was extensive discussion of the allocation of the cost of property damage, both past and future, among private interests, local governmental entities, and the Federal Government. See *ante*, at 607, n. 8 (quoting estimates of the costs of construction and acquisition of property). But there was *no* discussion that I have been able to find concerning potential liability for personal injuries. If Congress meant to include personal injury "damage" in the immunity conferred by §3, one would expect to find *some* explanation of why it authorized extraconstitutional compensation for property damage but nothing for personal injury. The expected explanation is nowhere to be found.

Construing the immunity sentence as a limit on the compensation authorized in §3 also avoids rendering that sentence superfluous. The 70th Congress had no reason to enact a special statute to protect the Federal Government from tort liability for personal injuries for the simple reason that another decade and a half was to pass before Congress enacted the Federal Tort Claims Act in 1946[6] and "put aside its sovereign armor in cases where federal employees have

---

*come in connection with it* at this place. I do not want to lose any rights in connection with it." *Ibid.* (emphasis added).

A short while later, the House passed Representative Garrett's amendment adding the proviso to the amendment containing the immunity provision. *Id.*, at 7023. Immediately thereafter, the House agreed to "the amendment of the gentleman from Illinois *as amended by the amendment of the gentleman from Tennessee.*" *Ibid.* (remarks of the Chairman) (emphasis added). The immunity provision and the proviso were thus considered and passed as a package.

[6] 60 Stat. 842–847.

tortiously caused personal injury or property damage."[7]    It is quite unrealistic to assume that in 1928 Congress enacted a special provision to avoid a liability from which it was already immune.[8]

It would be regrettable but obligatory for this Court to construe the immunity provision to bar personal injury claims if such was the intent of Congress.    But when a critical term in the statute suggests a more limited construction, and when the congressional debates are not only consistent with this construction, but nowhere reveal a recognition, let alone an intention, that the immunity provision would deprive

_____

[7] *American Stevedores, Inc.* v. *Porello*, 330 U. S. 446, 453 (1947).    It is interesting to note that in the Tort Claims Act itself, Congress repeatedly referred in the alternative to claims "on account of damage to or loss of property or on account of personal injury or death," see 60 Stat. 843, 845–846.

Revealingly, the Committee Reports on the Act did not understand there to be any bar to liability for personal injuries resulting from flood control projects:

" 'This is a highly important exception, intended to preclude any possibility that the bill might be construed to authorize suit for damages against the Government growing out of an authorized activity, *such as a flood control or irrigation project,* where no negligence on the part of any Government agent is shown.' "    *Dalehite* v. *United States*, 346 U. S. 15, 29, n. 21 (1953) (emphasis added) (quoting H. R. Rep. No. 2245, 77th Cong., 2d Sess., 10 (1942); S. Rep. No. 1196, 77th Cong., 2d Sess., 7 (1942); H. R. Rep. No. 1287, 79th Cong., 1st Sess., 5–6 (1945)).

[8] This construction is also consistent with 58 years of decisional law. The statute the Court construes today has been on the books for more than half a century, but prior to this case there appears to be no reported decision in which the Government successfully asserted it as a defense to a personal injury claim.    See 760 F. 2d 590, 599, n. 16 (CA5 1985).    It has been repeatedly and successfully invoked in property damage litigation, but the application of the statute that the Court upholds today is completely unprecedented.    Given the number and the size of federal flood control projects throughout our great Nation, and given the fact that the kind of recreational use disclosed by this record is fairly common, it is telling that, until today's decision, immunity had never been upheld in defense to such a claim.

those injured by governmental negligence of any remedy, a narrower interpretation is more faithful to the objective of Congress. It defies belief—and ascribes to the Members of Congress a perverse, even barbaric, intent—to think that they spent days debating the measure of extraconstitutional compensation they would provide riparian landowners but intended—without a single word of dissent—to condemn the widows, orphans, and injured victims of negligent operation of flood control projects to an irrational exclusion from the protection of the subsequently enacted Tort Claims Act.

I respectfully dissent.