Linda HENDERSON; Robert Henderson, III; Eric Henderson; Dorothy Henderson, Appellants,

v.

UNITED STATES of America, Appellee.

No. 91–1224.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 9, 1991.

Decided June 3, 1992.

---

Robert T. Beezley, Springfield, Mo., argued, for appellants.

Earl W. Brown, Asst. U.S. Atty., Springfield, Mo., argued, for appellee.

Before BOWMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

Linda Henderson, the wife of decedent, Robert F. Henderson, Jr., appeals the district court's summary judgment dismissal of her Federal Tort Claims action against the United States. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## BACKGROUND

The parties in this case do not dispute the facts. On January 10, 1987, Robert F. Henderson, Jr. was wade fishing on a gravel bar in Lake Taneycomo approximately one-fourth of a mile below Table Rock Dam near Branson, Missouri. The United States Army Corps of Engineers operates Table Rock Dam to provide hydroelectric power for the region. During the morning on which Robert Henderson was fishing, the Corps of Engineers released water from the dam to generate hydroelectric power. When the water was released, Robert Henderson was trapped on the gravel bar by rising lake waters and was eventually swept away to his death.

Robert Henderson had been fishing with a friend, Mary Ryan, with whom he had fished Lake Taneycomo in the past. Ryan testified that Robert Henderson had read a parking lot sign warning against rising waters,[1] that they customarily parked their car near the sign, and that Robert Henderson had told her, "Don't be caught out there, the Corps will drown you like a rat." After fishing for about 30 minutes on the morning in question, Ryan noticed that the water level was inching up her waders, so she walked 100 yards downstream to where Robert Henderson was fishing to see if he was reacting to the rise in water level. Around the same time, two boaters near Robert Henderson yelled to him that he needed to leave the lake because water was beginning to be released through the dam.[2] Although the boaters apparently heard the dam horn sound, Ryan, who was closer to the dam than Robert Henderson, claimed she did not hear it. Another fisherman near Robert Henderson also testified that he did not hear the horn. By the time Robert Henderson noticed the rising water and began to react to his predicament, the gravel bar on which he stood was being engulfed by and submerged under water. Once he realized he was in danger, Robert Henderson worked to get his waders off, but before he could do so, the water started rushing over his hips, until one large wave crept up his back and over his shoulders and washed him away.

The United States owns the portion of Lake Taneycomo where Robert Henderson was fishing. In October 1985, an assistant attorney general for the State of Missouri prepared a memorandum formally voicing concerns of citizens regarding the generating discharges from the Table Rock Dam and their effect on Lake Taneycomo. The memorandum recounted several instances in which fishermen had to be rescued from rising waters caused by the discharge of the dam; the memorandum particularly stated that "one resort owner who had been [on Lake Taneycomo] for several years said that eventually lives are going to be lost if some action is not taken." It concluded that "[t]he combination of the rapidity of the rising water and the existing warning system which cannot be heard

---

1. The sign read:
 Horn at Dam warns of generators coming on line. Be alert for sudden rises and move to higher ground. Once gates open, no additional warning is sounded when generation and water flow are increased. Your Safety–Our Concern. U.S. Army Corps of Engineers.

2. The identity of the boaters is unknown. Their warnings were reported by another fisherman who overheard their comments to Robert Henderson. As will be discussed, the third fisherman who overheard the boaters was not certain that Robert Henderson was the man whom the boaters were warning.

on some occasions and [at] some locations, and not understood on others, does create problems which apparently need to be dealt with," and specifically recommended educating the public on rapid water level changes and installing a warning system which would adequately alert people to expect changes in the water level. The attorney general's office submitted the memorandum to the Corps of Engineers. When it was not acted upon, several follow-up letters encouraging action were sent to the Corps of Engineers. After Robert Henderson drowned, the Corps of Engineers finally installed a louder, more audible horn.

Robert Henderson's wife, Linda, filed this wrongful death action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq. (1988). Under this Act, the federal government is liable "in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674 (1988). Henderson alleges that the government is liable for her husband's death under exceptions to Missouri's Recreational Use Statute, which exceptions aside, generally absolves landowners from liability for recreational accidents on their property.[3] The district court granted summary judgment against Henderson, ruling that Robert Henderson proximately caused his own death and that the exceptions to Missouri's Recreational Use Statute did not apply in this case.

## DISCUSSION

Before evaluating the district court's summary judgment dismissal of Linda Henderson's wrongful death action, we first address a jurisdictional issue raised by the government.

### I. Subject Matter Jurisdiction

■ Citing section 3 of the Flood Control Act of 1928, the government argues that this action must be dismissed for lack of subject matter jurisdiction. Section 702c provides that "[n]o liability of any kind shall attach to, or rest upon the United States for any damage from or by flood or flood waters at any place." 33 U.S.C. § 702c (1988). While we agree with the government's characterization of this language as sweeping, the Supreme Court has ruled that the immunity it bestows upon the government is not absolute. *See United States v. James,* 478 U.S. 597, 605 n. 7, 106 S.Ct. 3116, 3121, n. 7, 92 L.Ed.2d 483 (1986) (citing with approval *"Hayes v. United States,* 585 F.2d 701, 702–03 (CA4 1978) ('If the plaintiff could prove damage to this farm as a result of the dam's operation as a recreational facility without relation to the operation of the dam as a flood control project, he would avoid the absolute bar of § 702c.' ")); *cf. Zavadil v. United States,* 908 F.2d 334, 336 (8th Cir.1990) (claim for damages barred because "at the time of the [swimming] accident the water level [in the lake] was being monitored for flood control" purposes); *Dewitt Bank & Trust Co. v. United States,* 878 F.2d 246, 247 (8th Cir.1989) (claim for damages for diving injury barred because "in operating the project for flood control and navigation, the Corps maintained the waters at [a] shallow

---

3. The statute provides:
 Except as provided in sections 537.345 to 537.348, an owner of land owes no duty of care to any person who enters on the land without charge to keep his land safe for recreational use or to give any general or specific warning with respect to any natural or artificial condition, structure, or personal property thereon.
 Mo.Stat.Ann. § 537.346 (Vernon 1988); and
 Except as provided in sections 537.345 to 537.348, an owner of land who directly or indirectly invites or permits any person to enter his land for recreational use, without charge, whether or not the land is posted does not thereby:

 (1) Extend any assurance that the premises are safe for any purpose;
 (2) Confer upon such person the status of an invitee, or any other status requiring of the owner a duty of special or reasonable care;
 (3) Assume responsibility for or incur liability for any injury to such person or property caused by any natural or artificial condition, structure or personal property on the premises; or
 (4) Assume responsibility for any damage or injury to any other person or property caused by an act or omission of such person.
 Mo.Stat.Ann. § 537.347 (Vernon 1988).

level."). Accordingly, section 702c immunity applies if "governmental control of flood waters was a substantial factor in causing [the plaintiff's] injuries." *Dewitt Bank & Trust Co. v. United States*, 878 F.2d at 247; *see also Zavadil v. United States*, 908 F.2d at 336 (for the same proposition). We do not believe that section 702c bars Henderson's cause of action in this case because the dam activity here was related to generating electricity and not to flood control.

Table Rock Dam was created, in part, for flood control purposes. *See Goldberg v. Wade Lahar Constr. Co.*, 290 F.2d 408, 410–11 (8th Cir.1961). As the resident engineer at the dam testified, presently the primary purpose behind operating the dam is generating electric power. Indeed, the decision to release waters for generating electricity rests with the Associated Electric Cooperative, a private power company, which has contracted for this prerogative with the Department of Energy's Southwestern Power Administration. When the Associated Electric Cooperative decides it needs to tap the energy potential of Table Rock Dam, the Corps of Engineers is notified of this decision and releases water through the dam. Such releases are sporadic, do not conform to any predictable schedule, and occur at the request of the Associated Electric Cooperative. The Associated Electric Cooperative ordered the release of water on the day of Robert Henderson's death with the commercial purpose of generating power. On these facts, we cannot conclude that "governmental control of flood waters was a substantial factor in causing [Robert Henderson's] injuries." *Dewitt Bank & Trust Co. v. United States*, 878 F.2d at 247. We therefore hold that section 702c

of the Flood Control Act does not bar Henderson's claim against the government.

## II. Summary Judgment Dismissal

The district court granted summary judgment for the government because (1) Missouri's Recreational Use Statute immunized the government from liability, and (2) Robert Henderson proximately caused his own death. Linda Henderson attacks both of these rulings.

### A. Missouri Recreational Use Statute

The Missouri Recreational Use Statute generally immunizes a landowner from liability when an individual is injured while on the land for recreational purposes. *See* Mo.Ann.Stat. §§ 537.346 and 537.347 (Vernon 1988).[4] This landowner immunization does not apply, however, when (1) the government either acted maliciously or practiced gross negligence by failing to warn against a dangerous condition, or (2) the government merely negligently failed to warn or guard against an ultrahazardous condition. Under either alternative, the statute applies only if the government knew or should have known of the dangerous or ultrahazardous condition.[5] Noting that no Missouri case law has interpreted this legislation, the district court concluded that the government's operation of the dam was not malicious or grossly negligent and thus held that the Missouri Recreational Use Statute insulated the government from liability here. The district court did not discuss the statute's second exception relating to ultrahazardous conditions.

We first consider whether the government acted maliciously or practiced gross negligence by failing to warn or guard against the danger of releasing the dam waters.[6] Missouri's Recreational Use Stat-

---

**4.** *See* n. 3 *supra* for the statutory text.

**5.** The exception reads:

Nothing in this act shall be construed to create liability, but it does not limit liability that otherwise would be incurred by those who use the land of others, or by owners of land for:

(1) Malicious or grossly negligent failure to guard or warn against a dangerous condition, structure, personal property, which the owner

knew or should have known to be dangerous, or negligent failure to guard or warn against an ultrahazardous condition which the owner knew or should have known to be dangerous. Mo.Stat.Ann. § 537.348(1) (Vernon 1988).

**6.** The government argues that Henderson did not allege malice or gross negligence in her complaint, thus precluding the consideration of these issues on appeal. *See Kern v. Prudential Ins. Co. of America*, 293 F.2d 251, 259 (8th

ute has not been interpreted by the Missouri appellate courts.[7] Moreover, the statute does not define "gross negligence" or "malicious," so we must look to other Missouri law to determine the meaning of these two terms.

### 1. Gross Negligence

■ As a general rule, the Missouri courts "do not distinguish between negligence and gross negligence, as such, since they do not recognize *degrees* of negligence." *Warner v. Southwestern Bell Tel. Co.,* 428 S.W.2d 596, 603 (Mo.1968) (emphasis in original) (citations omitted). "While the courts have not recognized degrees of negligence in dealing with the common law, the [Missouri] General Assembly has not found itself so restricted...." *Duncan v. Missouri Bd. for Architects, Professional Engineers & Land Surveyors,* 744 S.W.2d 524, 532 n. 4 (Mo. Ct.App.1988) (identifying statutes that establish a gross negligence standard). Resultingly, the Missouri courts have been forced to articulate a definition of gross negligence. Even so, the Missouri courts have thus far expressly defined "gross negligence" only in the context of a professional licensing case. *See id.* at 533. In *Duncan,* gross negligence was defined in the licensing context as "an act or course of conduct which demonstrates a conscious indifference to a professional duty." *Id.* This definition was not formulated by the court itself but rather was proposed by a professional licensing commission. The court nonetheless upheld the definition utilized by the commission. *Id. Duncan's* approval of the conscious indifference standard conforms with other Missouri case law which, while not establishing a definition of gross negligence, nonetheless equates gross negligence with a reckless disregard for proper conduct. *See, e.g., O'Brien v. B.L.C. Ins. Co.,* 768 S.W.2d 64, 70, 75 (Mo.1989) (en banc).

Cir.1961). We disagree. In her complaint, Henderson sufficiently alerted the government that malice and gross negligence would be a subject of this case. Indeed, in its answer to Henderson's complaint, the government cited Missouri's Recreational Use Statute as a defense, thereby demonstrating that the government knew that the provisions of this statute would be at issue in this case. *See* 5 Wright Charles & Arthur Miller, *Federal Practice and Procedure* 548–60 (2d ed. 1990).

7. While no court has interpreted Missouri's Recreational Use Statute, this court has interpreted an analogous Arkansas Recreational Use Statute in an action similar to the one here. *See Mandel v. United States,* 719 F.2d 963 (8th Cir. 1983). *Mandel* involved a diving accident at Buffalo River National Park in Arkansas, after which the injured swimmer alleged that his injury resulted from the willful and wanton conduct of park employees, who recommended that Mandel swim in a particular part of the river even though the park service never inspected the swimming hole for potential safety hazards nor posted any warning concerning possible dangers arising from diving into the river in that particular spot. This court reversed a grant of summary judgment for the government, because "different ultimate inferences might reasonably be drawn [from the undisputed facts] as to which reasonable persons might differ." *Id.* at 968 (citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). In reaching this conclusion, the court emphasized that "when considered in the light most favorable to" Mandel, it could be reasonably inferred that the "National Park Service would have reason to know of submerged rocks" in the recommended swimming area, that the "National Park Service would have reason to believe that an injury was foreseeable, likely or probable," and that recommending the particular swimming area with knowledge of submerged rocks generally "was a willful and wanton failure to warn against the dangerous condition." *Mandel v. United States,* 719 F.2d at 967.

The facts here, as demonstrated by the 1985 memorandum submitted by Missouri's attorney general's office to the Corps of Engineers, establish that the government was aware of the danger created by the existing dam warning system. The situation in this case, however, is somewhat different from that in *Mandel.* In *Mandel,* a park ranger recommended to Mandel that he swim in the area containing the submerged rocks; the record here does not indicate that the government recommended that Robert Henderson fish below the dam. On the other hand, the government had greater and more specific knowledge of the danger caused by the dam operation here. The government knew that people fished below the dam, had been informed that the warning system was inadequate, and had been previously notified of situations in which the release of the dam waters nearly resulted in tragedy. In contrast, in *Mandel,* the government had less specific knowledge regarding the potential for harm created by the submerged rocks.

While we are not dealing with a licensing situation here, we find *Duncan* instructive. As noted earlier, the Missouri attorney general's office had repeatedly notified the Corps of Engineers concerning the faults and potential dangers of the Table Rock Dam warning system. Despite this persistence, the Corps of Engineers took no corrective measures until after Robert Henderson's death. This neglect raises a genuine issue of material fact as to whether the government was guilty of gross negligence, or in the parlance of *Duncan*, whether the government demonstrated a conscious indifference regarding the safe release of waters through Table Rock Dam. *Accord Umpleby v. United States*, 806 F.2d 812, 816 (8th Cir.1986) (reversing summary judgment where there were genuine issues of material fact as to whether the United States willfully or maliciously failed to warn of a dangerous condition in violation of North Dakota's Recreational Use Statute); *see also Mandel v. United States*, 719 F.2d 963, 967 (8th Cir.1983) (reversing summary judgment on the same grounds under the Arkansas Recreational Use Statute). Thus, summary judgment is not appropriate for Henderson's gross negligence claim. This ruling is particularly compelled when it is recalled that "a case is not suitable for summary judgment where there are undisputed facts from which different ultimate inferences might reasonably be drawn and as to which reasonable persons might disagree." *Mandel v. United States*, 719 F.2d 963, 968 (citing *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

*2. Malice*

█ As noted earlier, the Missouri courts have not yet interpreted that state's Recreational Use Statute nor does the statute itself define "malicious." The Supreme Court of Missouri, however, has provided a comprehensive review of malice under Missouri law. *See Sanders v. Daniel Int'l Corp.*, 682 S.W.2d 803 (Mo.1984) (en banc). In reviewing an action for malicious prosecution, *Sanders* delineated three degrees of malice: malice in fact, malice in its legal sense, and malice in law. *Id.* at 807–08

(citations omitted). Malice in fact "is founded in ill will, 'and is evidenced by an attempt to vex, injure, or annoy another.'" *Id.* at 807 (quoting *Davis v. Hearst*, 160 Cal. 143, 116 P. 530, 537 (1911)). According to *Sanders*, malice in its legal sense, or legal malice, "has a broader meaning [than malice in fact and] ... embraces any improper or wrongful motive," and could include "conduct which is so reckless or wantonly and willfully in disregard of one's rights that a trier of fact could infer from such conduct bad faith or *malo animo*." *Id.* at 807–08 (emphasis in original) (citations omitted). Finally, malice in law merely requires a showing that a defendant committed a wrongful act without just cause or excuse. *Id.* at 808.

While helpfully defining these three degrees of malice, the Missouri courts offer little guidance as to which standard applies here. In *Sanders*, however, the Supreme Court of Missouri relied upon the legal terms "wanton" and "willful" to define "malice" in its legal sense. *Id.* at 808. Because other states deploy terms in their recreational use statutes similar to those used by *Sanders* to define legal malice— *see, e.g.*, Neb.Rev.Stat. § 37–1005 (1988) ("willful or malicious"); N.D.Cent.Code § 53–08–05 (1989) ("willful or malicious"); and S.D. Codified Laws Ann. § 20–9–16 (1991) ("willful or wanton")—we believe that were the issue before the Supreme Court of Missouri, it would equate "malicious" in Missouri's Recreational Use Statute with "malice" in its legal sense. While the threshold for establishing legal malice is not as extreme as malice in fact, to satisfy it, there still must be "'a general wickedness or intent on the part of a person; a depraved inclination to do harm, or to disregard the rights or safety of mankind generally.'" *Sanders*, 682 S.W.2d at 808 (quoting N. Newell, *Newell on Malicious Prosecution* 239 (1892)).

Henderson has offered no evidence indicating that the government neglected to improve the dam warning system in the hope that someone would suffer because of the system's inadequacies. Without such evidence, no genuine issue of material fact

infers that the government intended to harm Robert Henderson or others. Accordingly, we affirm the district court's ruling that "there are certainly no facts to indicate that [the government] was malicious."

### 3. Ultrahazardous Activity

■ The government can also violate Missouri's Recreational Use Statute if it negligently failed to warn of an ultrahazardous activity. *See* Mo.Ann.Stat. § 537.-348(1) (Vernon 1988). To ascertain whether Henderson has an action under this provision of the Recreational Use Statute, we must determine whether the operation of the dam could qualify as an ultrahazardous condition. No Missouri case law has examined whether the operation of a dam is an ultrahazardous activity. Both parties therefore urge us to apply section 520 of the *Restatement (Second) of Torts* for determining whether the release of water through the dam was an ultrahazardous activity. We accept this invitation. Section 520 provides:

> **§ 520. Abnormally Dangerous Activities**
>
> In determining whether an activity is abnormally dangerous, the following factors are to be considered:
>
> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Restatement (Second) of Torts* § 520 (1977).

Earlier, we reviewed Henderson's claim that the government acted maliciously and negligently by not improving the dam warning system, which the government knew was inadequate. Under Henderson's

theory, had the government acted responsibly, the tragedy underlying this case would not have occurred. In other words, Henderson contends that the government could have "eliminated the risk [of harm] by the exercise of reasonable care."

Now, however, Henderson urges that the release of waters through the dam was an ultrahazardous activity. By definition, the risk intrinsic in an ultrahazardous activity cannot be eliminated (thus justifying the customary imposition of strict liability). Therefore, Henderson cannot successfully claim that the government acted maliciously or practiced gross negligence in operating the dam and then turn around and successfully claim that operating the dam was an ultrahazardous activity. At this juncture in the life of the case, however, we are not reviewing the ultimate success of Henderson's respective claims. Instead, we are determining whether Henderson's claim that the dam operation was an ultrahazardous activity can survive summary judgment.

In light of the considerations outlined by the Restatement, a genuine issue of material fact exists as to whether the release of water through the dam was an ultrahazardous activity. Rapidly releasing water through a dam creates a sudden surge of water and a rising water level, which together result in a high degree of risk of harm, as evidenced by Robert Henderson's death and the near accidents that preceded his tragedy. *See Restatement (Second) of Torts*, § 520(a) (1977). That the harm resulting from this risk will be great is obvious: rushing and rising water can leave substantial, and oftentimes tragic, damage in its wake. *See Restatement (Second) of Torts*, § 520(b) (1977). Whether reasonable care could have eliminated the risk of harm here is not so easily determined. At this juncture in the proceedings, the record has not been developed regarding whether a warning system could have been reasonably installed which would have overcome the factors, such as weather, high wind, and the location of downstream fishermen, which resulted in the warning system failing to alert persons below the dam that

water was being released through the dam. *See Restatement (Second) of Torts* § 520(c).[8]

This latter consideration of whether the risk created by the operation of the dam can be eliminated by reasonable care is the crucial factor in determining whether the operation of the dam is an ultrahazardous activity. The government's failure to respond to the complaints concerning the dam warning system suggest that an adequate warning system could not reasonably be installed and support Henderson's claim that the operation of the dam was an ultrahazardous activity. This factual issue cannot be resolved on summary judgment. *See Mandel v. United States*, 719 F.2d at 968 ("[A] case is not suitable for summary judgment where there are undisputed facts from which different ultimate inferences might reasonably be drawn and as to which reasonable persons might disagree.") (citing *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *see also Hendricks v. Missouri–Kansas–Texas R.R. Co.*, 709 S.W.2d 483, 493–94 (Mo.Ct.App.1986) (ruling that trial court inappropriately permitted an expert witness to express an opinion regarding whether a railroad crossing was unusually dangerous because none of the factors relied on by the expert in framing his opinion exceeded the understanding of the jurors who could determine for themselves whether the crossing was unusually dangerous).

### B. Proximate Cause

■ Henderson next contends that the district court erred in ruling that the government did not proximately cause her husband's death. The district court held that because Robert Henderson knew of the danger associated with fishing below the dam, this knowledge discharged the government of its duty to warn or guard him against this danger. In the district court's words, "[A] landowner has no duty to give notice to one who already has no-

tice." Based on this reasoning, the district court ordered summary judgment against Henderson.

Henderson claims that while her husband knew that water was occasionally released through the dam, he was not aware of the specific danger on the morning of his death. *See Cross v. Lindenwood Colleges*, 677 S.W.2d 423, 425 (Mo.Ct.App.1984) ("knowledge on the part of an invitee of the general condition from which danger arises does not necessarily constitute knowledge and appreciation of the danger actually encountered."). Henderson contends that had the danger been ever present and never changing, then her husband would have been aware that he had placed himself in harm's way. Henderson further argues that while the decedent knew that water might be released through the dam, as warned by the parking lot sign, he relied on the siren to alert him to the release of water, and that it was the inadequacy of the siren which caused his death. To further this theory, Henderson notes that neither the decedent's fishing companion nor another nearby fisherman heard the warning siren on the morning in question.

In response, the government cites *Will v. United States*, 849 F.2d 315 (8th Cir.1988), a case which survived summary judgment and was the subject of a three-day trial. *Will* involved a swimming-hole diving accident where Will struck his head on the river's bottom, rendering him a quadriplegic. Because Will knew that diving at the hole was dangerous and that he might strike his head on the river bottom (he had actually conducted a preliminary search of the hole to determine its depth), this court did not find clear error with the district court's conclusion that Will proximately caused his injury. *Id.* at 318.

We find the case here to be distinct from *Will*. The danger of striking the river bottom in *Will* was constant. Here, how-

---

**8.** We recognize that we have canvassed only three of the six factors suggested for consideration by the *Restatement*. As the text proceeds to explain, we feel that the factor of whether the risk of harm created by the dam warning sys-

tem could have been reasonably eliminated will ultimately determine whether the operation of the dam was an ultrahazardous activity. We thus decline to address the remaining considerations outlined by the *Restatement*.

ever, fishing below the dam gave rise to danger only when water was released through the dam. This intermittent danger accounts for the very existence of the warning system. Only during the operation of the dam was it dangerous to be fishing in Lake Taneycomo; otherwise, fishermen did not have to worry about rapidly rising water levels. Fishermen, like Robert Henderson, relied upon the dam siren to notify them that danger loomed. Thus, a genuine issue of material fact exists as to whether the inadequacy of the warning system or whether Robert Henderson's own negligence proximately caused his accident. *See Hill v. Air Shields, Inc.*, 721 S.W.2d 112, 119 (Mo.Ct. App.1986) (a jury must decide whether defendant's failure to warn proximately caused plaintiff's injury).

## CONCLUSION

We affirm the district court's dismissal of Henderson's claim that the government acted maliciously in failing to adequately announce the dam's operation. We reverse the district court's ruling that, as a matter of law, the government was not grossly negligent in failing to warn Robert Henderson that water was being released through the dam, and further hold that the release of water through the dam might create an ultrahazardous condition. We also reverse the district court's summary judgment ruling that Robert Henderson proximately caused his own death. Accordingly, this case is remanded for further proceedings consistent with this opinion.

BOWMAN, Circuit Judge, dissenting.

Plaintiffs' claim is that defendant failed to sound an adequate warning of the release of water from the dam, and that this failure was the proximate cause of Robert Henderson's drowning. Based on the uncontroverted evidence, the District Court granted summary judgment in favor of defendant, holding that even if defendant had failed to sound an adequate warning, this failure could not have been the proximate cause of Henderson's death, for Henderson clearly had actual knowledge the water

was rising in ample time to make his way safely from the gravel bar to the shore. Accordingly, a louder blast of the siren would not have put Henderson on notice of anything he did not know in sufficient time to allow for a margin of safety, yet for reasons known only to him he delayed his departure from the gravel bar until it was too late. This unnecessary delay on his part, and not defendant's failure to warn adequately, if indeed defendant was guilty of such a failure, was the fatal error. *See Will v. United States*, 849 F.2d 315, 318 (8th Cir.1988) (defendant's asserted failure to warn of dangers of diving at a particular campsite was not the proximate cause of plaintiff's injuries in view of plaintiff's knowledge and evidence that a warning would not have deterred plaintiff from engaging in the dangerous activity).

The District Court determined there was no triable issue concerning Henderson's early awareness that the water was rising. I am satisfied that its decision is correct and should not be disturbed. Therefore, I respectfully dissent.