**Scott BAILEY, Plaintiff–Appellant,**

v.

**UNITED STATES of America, DEPART- MENT OF the ARMY CORPS OF EN- GINEERS, Defendant–Appellee.**

No. 93–1549.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1994.

Decided Sept. 14, 1994.

Paula Newcomb, Benton, IL (argued), for plaintiff-appellant.

Robert L. Simpkins, Asst. U.S. Atty., Crim. Div., James M. Hipkiss, Office of U.S. Atty., Civ. Div., Fairview Heights, IL (argued), for defendant-appellee.

Before MANION and ROVNER, Circuit Judges, and PLUNKETT, District Judge.*

ILANA DIAMOND ROVNER, Circuit Judge.

Scott Bailey filed suit against the federal government under the Federal Tort Claims Act for the injuries he suffered while diving in a flood control lake managed by the U.S. Army Corps of Engineers in Southern Illinois. The district court dismissed the case for lack of subject matter jurisdiction, concluding that the Flood Control Immunity Act of 1928 rendered the government immune from suit. In light of our opinion in *Fryman v. United States,* 901 F.2d 79 (7th Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990), we vacate the judgment and remand for further factual development as to whether the flood control features of

* The Honorable Paul E. Plunkett, of the Northern District of Illinois, sitting by designation.

the lake rendered Bailey's injuries more likely to occur than they would have been in a purely recreational lake.

## I. FACTS

In the mid–1960s, the Corps of Engineers created Rend Lake, near Benton, Illinois, as part of a $35 million flood control project.[1] More than twenty years later, in 1986 or 1987, the Corps constructed a beach at the Sleepy Hollow campground adjacent to the lake in order to encourage recreational use of the area.[2] At some time prior to or during the construction of the beach, the Corps cut down a dead or dying tree situated in the midst of the lake near the beach. The Corps lacked the equipment to remove the tree entirely, so it instead sawed the tree off at the trunk approximately four to five feet above the water line. The subsequent use of the remaining stump as a diving platform gave rise to the injuries underlying this suit.

On July 14, 1989, Scott and Leigh Anne Bailey attended the annual reunion of Leigh Anne's family at the Sleepy Hollow campground. Bailey ventured into the lake and, after nailing several branches to the side of the tree stump to serve as climbing rungs, he and a teenaged relative began "cannonballing" off the stump into the water. Although he claims to have explored the lake bottom in the immediate vicinity of the stump to make sure it was clear of debris before beginning to dive, when he did jump into the lake, Bailey was impaled upon a submerged stub extending upward from the rootwad of the tree and suffered severe internal injuries.

In the immediate aftermath of this incident, the Corps closed the beach temporarily and hired a diving company to remove the tree stump. Before doing so, the divers inspected the lake bottom surrounding the stump and observed three vertical stubs emerging from the rootwad of the tree at distances of two, nine, and twelve feet from the stump itself. The lake was seven to eight feet deep in this area, and each of the stubs extended upward approximately four feet from the bottom of the lake. The divers also noted a number of other tree sections with protruding limbs and stubs on the lake bottom in the immediate vicinity. These were removed together with the stump from which Bailey had been diving.

Bailey brought suit against the government under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2674, contending that the Corps had been negligent in leaving the sawed-off tree stump in the water (creating a hazard that would attract swimmers) and in failing to remove other submerged tree trunks and branches from the area.[3] We should point out that the Corps had used floating PVC pipe to delineate a swimming area of approximately eighty-two by ninety-seven feet and had apparently cleared the lake bottom in this area of all debris. The stump from which Bailey dove was approximately forty-five feet beyond the designated swimming area. Nonetheless, Bailey alleges that the Corps knew that swimmers commonly strayed beyond this area and yet negligently failed to remove debris that might endanger such swimmers. R. 1 at 2 ¶ 10.

1. Rend Lake was authorized by the Flood Control Project Act of 1962, P.L. 87–874, October 23, 1962. There is no dispute that the lake was constructed for the purpose of flood control. *Compare Williams v. United States*, 957 F.2d 742 (10th Cir.1992) (government not protected from suit for injuries caused by waters released from dam, where record did not establish that dam was constructed for flood control).

2. "It is the policy of the Corps to manage the flood control projects in a manner that allows for recreational use." *Dawson v. United States*, 894 F.2d 70, 72 (3d Cir.1990) (citing 36 C.F.R. § 327.1 (1988)).

3. Leigh Anne Bailey also sued for loss of consortium. The district court dismissed that claim because unlike her husband, Mrs. Bailey had not filed an administrative claim before bringing suit as required by the Tort Claims Act, 28 U.S.C. § 2675(a). Feb. 3, 1992 Mem. and Order at 1–2. Although the Baileys attempted to appeal that ruling, the notice of appeal did not properly identify Mrs. Bailey as an appellant as required by Fed.R.App.P. 3(c). We therefore dismissed her appeal for want of jurisdiction on the authority of *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). We note that Rule 3(c) has since been amended to provide that "[a]n appeal shall not be dismissed ... for failure to name a party whose intent to appeal is otherwise clear from the notice," thus overruling *Torres*. *See Garcia v. Wash*, 20 F.3d 608, 609 (5th Cir.1994).

On the government's motion, the district court dismissed the suit for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), concluding that the government was immune from suit for Bailey's injuries. Although it acknowledged the seeming injustice of the result, the court found itself constrained by the immunity provision of the Flood Control Act of 1928, 33 U.S.C. § 702c, and the broad construction given that provision by the Supreme Court in *United States v. James,* 478 U.S. 597, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986).

## II.  ANALYSIS

The Flood Control Act of 1928 provides that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place...." 33 U.S.C. § 702c. Although courts have long construed this statute to bar claims for property damage caused by flood control waters, for nearly sixty years, it remained uncertain whether section 702c applied to personal injury claims.[4]

The Supreme Court settled that question in *James,* holding that section 702c immunity does extend to suits for personal injury. 478 U.S. at 605, 106 S.Ct. at 3121. In each of the two cases consolidated before the Court in *James,* a flood-control dam had been opened to release lake water, triggering strong currents that swept recreational boaters through the sluice gates of the dam. The plaintiffs brought suit, contending that the government had failed to warn them away from the hazardous areas of the lake. Although they complained of bodily injury rather than property damage, the Court nonetheless concluded that section 702c bestowed immunity on the government. The Court reasoned that the statute's facially broad proscription of "liability of *any* kind" for "*any* damage suffered from or by floods or flood waters" necessarily applies to suits for personal injuries. *Id.* at 605, 106 S.Ct. at 3121. The Court went on to emphasize that the reach of the statute extended to all waters within the scope of a flood control project, not just those that one might ordinarily think of as "floodwaters":

> The Act concerns flood control projects designed to carry floodwaters. It is thus clear from § 702c's plain language that the terms "flood" and "flood waters" apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control.

*Id.* at 605, 106 S.Ct. at 3121. In a like vein, the court rejected the notion that a distinction could be drawn for immunity purposes between government conduct directly related to flood control per se and activities related to the recreational aspects of a flood control reservoir. The manner in which recreational users of such a facility are warned of hazards, the Court reasoned, is part and parcel of the management of a flood control project, even if recreational activities do not themselves constitute "flood control." *Id.* at 609–10, 106 S.Ct. at 3123.

Despite the evident breadth of *James,*[5] the circuits have declined to treat it as an absolute bar to any suit for personal injuries resulting in some way from the management of a flood control project. These courts have taken their cue from a footnote in *James* that distinguished two cases finding an exception to immunity where the cause of injury was "wholly unrelated" or "without relation" to flood control. *See James,* 478 U.S. at 605 n. 7, 106 S.Ct. at 3121 n. 7 (citing *Morici Corp. v. United States,* 681 F.2d 645, 647–48 (9th Cir.1982), and *Hayes v. United States,* 585 F.2d 701, 702–03 (4th Cir.1978)). But cases inquiring whether the source of harm had some nexus to flood control have not adopted a uniform analysis and have reached inconsistent results.

The Ninth Circuit inquires whether the accident at issue was "wholly unrelated" to flood control. *See McCarthy v. United States,* 850 F.2d 558, 562 (9th Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103

---

4.  *See generally* Note, *United States v. James: Expanding the Scope of Sovereign Immunity for Federal Flood Control Activities,* 37 Cath.U.L.Rev. 219, 229–30 (1987).

5.  *See Fryman,* 901 F.2d at 81 ("we find it hard to conceive how a decision interpreting this statute could have been more broadly written").

L.Ed.2d 581 (1989). This inquiry is conducted in broad "but for" terms; the court has concluded, for example, that a drowning is within the scope of the government's immunity when the lake in which the swimmer drowned would not have existed but for the flood control project. *Id.* at 562–63; *see also Mocklin v. Orleans Levee Dist.,* 877 F.2d 427, 430 (5th Cir.1989) ("The flotation channel in which the Mocklins allege the drowning occurred properly can be said to contain water related to flood control.... The channels were inescapably part of a flood control project. The inquiry ends, then, and the Government is protected from 'any' liability caused by those waters.").

The Third Circuit employs the same "wholly unrelated" language, *Dawson v. United States,* 894 F.2d 70, 73–74 (3d Cir.1990), but in a somewhat more discriminating fashion. That court looks to whether the particular circumstance cited as the cause of injury (in *Dawson* the unsafe depth of the lake) was due to the use of the lake in flood control. *Id.* at 74; *see also Mocklin,* 877 F.2d at 430 (flotation channel created significant drop-off in lake, which contributed to drowning); *Fryman,* 901 F.2d at 82 (noting the distinction).

The Eighth Circuit, on the other hand, asks whether flood control was a "substantial factor" in the plaintiff's injury. *See Dewitt Bank & Trust Co. v. United States,* 878 F.2d 246, 247 (8th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 493 (1990); *Zavadil v. United States,* 908 F.2d 334, 336 (8th Cir.1990) (per curiam), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991). On its face this might seem to be a more demanding standard. In fact, however, it is one derived from the Ninth Circuit's opinion in *McCarthy,* 850 F.2d at 563; and in practice, the Eighth Circuit's "substantial factor" analysis operates much like the "wholly unrelated" inquiry as applied by the Third Circuit in *Dawson.* Thus, both *DeWitt Bank & Trust* and *Zavadil* found that injuries incurred when swimmers dove into shallow waters were made more likely by flood control activity that affected the water level of the lake. *See also Swain v. United States,* 825 F.Supp. 966, 973 (D.Kan.1993) (presence of submerged tree stump that plaintiff struck when he slid into the lake from houseboat "was a natural and direct result of flooding the bottomland above the dam" and was thus "attributable in substantial part to the nature of a flood-control project"); *cf. Henderson v. United States,* 965 F.2d 1488, 1492 (8th Cir. 1992) (flood control was not a "substantial factor" in boater's death where water was released for power generation, although lake was built in part for flood control).

The Tenth Circuit set itself apart from these courts in *Boyd v. United States,* 881 F.2d 895, 900 (10th Cir.1989), rejecting the "wholly unrelated" exception as too narrow and concluding that government is not immune from "liability associated with operating a recreational facility." Thus, it found that the collision of a speed boat with a snorkeler was beyond the immunity conferred by section 702c. *See also Denham v. United States,* 646 F.Supp. 1021, 1026–27 (W.D.Tex.1986) (Corps' failure to remove or warn about submerged concrete anchor that diver struck had nothing to do with operation of the lake as a flood control project and was instead part of the operation of a recreational facility), *aff'd on other grounds,* 834 F.2d 518 (5th Cir.1987). Yet, as we have pointed out, that rationale would appear directly contrary to *James,* which stressed that even decisions as to the recreational uses of a flood control project fall within the purview of the statute. *Fryman,* 901 F.2d at 81.

In sum, no single means of delimiting the government's immunity has emerged from the other circuits. Indeed, it is not even settled with *what* there must be a flood control nexus—the project, the risk that led to the particular accident, or the plaintiff's injury. *See Fryman,* 901 F.2d at 82; *Mocklin,* 877 F.2d at 430 n. 6.

We confronted the post-*James* case law in *Fryman,* and in his thoughtful opinion for the court, Judge Easterbrook suggested alternate means of articulating, in a principled fashion, the boundaries of the government's immunity. Not unlike Bailey, the plaintiff in *Fryman* had jumped into a flood control lake and struck a concealed hazard that broke his neck and rendered him paralyzed. Rather than jumping from a tree stump, however,

Fryman dove from an island that emerged from the lake when the waterline was low and was submerged at other times. Fryman contended that the Corps had been negligent (even malicious) in failing to post appropriate warnings or to close the island to recreation.

We began our analysis with the acknowledgement that given *James'* broad construction of the statute, "[e]very drop of water in [a flood control lake] is 'flood water' within the meaning of § 702c, and the statute blocks recovery if the injury is 'damage from or by' these waters." 901 F.2d at 80. We then went on to reject Fryman's argument that his injury had not been caused by "flood water" as defined by *James,* but rather by the concealed hazard coupled with the Corps' failure to warn him away from it.

> Attributing motives and deeds to water is not a way around *James.* In both cases the responsible actors were federal employees, and the negligence (if any) lay in not taking precautions. Water played some role in both—in *James* creating the fatal current, in this case concealing the obstacle and creating the motive for the dive. The government could have kept boats off the lakes involved in *James,* or it could have kept boaters farther back from the sluices; decisions concerning the recreational use of the lakes led to the deaths, just as (Fryman contends) decisions concerning the recreational aspects of Lake Shelbyville led to his injury.

*Id.* at 81.

We acknowledged nonetheless that *James'* broad holding cannot be taken too far; that is, not everything with some link to flood control can be deemed to fall within the scope of section 702c. We explained:

> The "management of a flood control project" includes building roads to reach the beaches and hiring staff to run the project. If the Corps of Engineers should allow a walrus-sized pothole to swallow tourists' cars on the way to the beach, or if a tree-trimmer's car should careen through some picnickers, these injuries would be "associated with" flood control. They would occur within the boundaries of the project, and but for the effort to curtail flooding the injuries would not have happened. Yet

they would have nothing to do with the management of flood waters, and it is hard to conceive that they are "damage from or by floods or flood waters" within the scope of § 702c.

*Id.* See *Cox v. United States,* 827 F.Supp. 378, 381–82 (N.D.W.Va.1992) (injuries sustained by child who fell from swing adjacent to flood control lake "had no connection with floods or flood waters").

■ "If § 702c has limits," we proceeded, "they have to do with causation." 901 F.2d at 81. We noted that one way of deciding whether the government enjoys immunity is to ask "whether the injury stemmed from features that differentiate flood-control lakes from purely recreational lakes." *Id.* at 81–82. Thus:

> Boaters in *James* drowned because the imperatives of flood control led to the release of water from the lake. Collisions between swimmers and powerboats, by contrast, occur on natural lakes and purely recreational artificial lakes; none of the flood-control activities increase the probability of such a run-in.

*Id.* at 82. Alternatively, we observed that a given injury might be considered unrelated to flood control and thus beyond the scope of the government's immunity "only when the existence of the project does not increase its probability." *Id.*

Ultimately, we concluded that the government was immune from suit in *Fryman* because it was clear that "[f]lood control activities increase the probability of injuries such as Fryman's." *Id.* Both the existence and the shoreline of the island from which Fryman dove into the lake were at the mercy of the lake's flood control features: as water levels rose in the spring with the accumulation of flood waters, the island was submerged; only when water was released from the lake during the summer and fall did the island materialize and lure picnickers and swimmers to its shores. And even during low-water periods when the island was present, the hazards presumably varied with the contours of its shoreline and the depth of the surrounding waters. Thus, it would be difficult for the Corps to have posted signs warn-

ing people away from dangerous areas, when those areas changed with the water level of the lake. *Id.*

Here, the district court construed *Fryman* as excepting only a narrow category of circumstances from section 702c immunity—the walrus-sized pothole and the careening tree-trimmer, for example. Jan. 6, 1993 Order at 5–6 (citing *Fryman* and the Third Circuit's opinion in *Dawson*, 894 F.2d at 74). "If the injury occurred on or about a body of water created by or used as part of a flood control project, then the water in some sense caused the injury and one is led inexorably back to the resulting immunity as in *James.*" *Id.* at 6 (citing *McCarthy*, 850 F.2d at 561–62). The government makes much the same argument to us on appeal: because Bailey injured himself in the waters of a flood-control lake, section 702c immunity applies regardless of the particular circumstances that led to his injury. That rationale would be consistent with the broad approach of the Ninth Circuit in *McCarthy*.

We do not read *Fryman* as closing the book on this subject, however. Although we did cite the hypotheticals of injuries occurring outside of the lake as examples of situations to which immunity would clearly not apply despite some tie to a flood control project, the opinion did not in any way purport to limit the exceptions to immunity to these examples. Indeed, Judge Easterbrook quite carefully explored the ways one might define a category of cases in which the government would not enjoy immunity even if the injury occurred within the flood waters of the lake. Moreover, although the court ultimately concluded that immunity barred Fryman's suit given the evidence that the flood control activities of Lake Shelbyville increased the probabilities of his injury, it explicitly left open the question of whether the result might be different in the absence of such evidence:

> We do not decide whether a recreational injury on a flood-control lake could be actionable under the FTCA when the flood-control activities did not increase the

probability of the injury compared with a natural lake devoted to recreational use. Resolution of that question must wait until the answer makes a difference.

*Id.* at 82.

■ Unfortunately, the parties seem not to have focused on the question we left outstanding in *Fryman*. The record in its present state does not enable us to conclude, as we did in *Fryman*, that the flood control activities of Rend Lake made it more likely that Bailey would suffer the kind of injury he did than would be true in a natural lake. Presumably, for example, the flood control characteristics of Rend Lake result in the cyclical rise and fall of the water level that we noted in *Fryman* (although the record is largely silent even on this basic point).[6] But we cannot determine whether this would leave the tree stump submerged during periods of high water (thus eliminating the lure of a diving platform), nor can we ascertain whether during periods of low water the stubs protruding upward from the rootwad might emerge above the water line (making the danger apparent). So far as we know, neither the use of the stump as a diving platform nor the visibility of its roots changed significantly with the rise and fall of the lake level. Thus, the hazard could have been a constant hazard that would have been simple to identify or eliminate, in contrast to the situation in *Fryman*. It is also not clear that this was a situation unique to flood control lakes—presumably trees can emerge in the midst of natural lakes as well to the extent that the shoreline moves with rain and drought cycles. Perhaps, as the government seems to assume, all of this is irrelevant—that because Bailey met with his injury in the waters of the lake, and because it was those waters that concealed the hazard, he was injured by or because of flood waters within the meaning of *James*. *See, e.g., McCarthy*, 850 F.2d at 563. But we did not go so far in *Fryman*; on the contrary, we held out the possibility that we might find no immunity where the flood control characteristics of a Corps project did not increase the

---

6. We are told, for example, that the water level of the lake on the date Bailey was injured was "within the flood control zone of the project" (Aff. of Phillip Jenkins ¶ 5), but the record does not reveal what impact, if any, this had on the area of the lake in which Bailey was injured.

probability of injury to the plaintiff or where the injury did not result from features that differentiate flood control lakes from purely recreational lakes. 901 F.2d at 81–82.

This is an area of the law in which we are inclined to tread carefully, as our opinion in *Fryman* reflects. If, as in that case, the evidence establishes that the flood control activities or characteristics of Rend Lake rendered injuries like Bailey's more likely than they would be in a non-flood control lake, then we need proceed no further—in that event, *Fryman* would entitle the government to immunity. If not, however, we will be unable to postpone any longer a decision as to whether the government enjoys immunity for injuries that are just as likely to occur in non-flood control lakes. Because the parties have not developed the record adequately with respect to whether and to what extent the flood control features of Rend Lake contributed to Bailey's injury, we believe it the most prudent course to remand for further factual development and findings by the district court in this area, and for further consideration of the possible exceptions to immunity we identified in *Fryman*.[7]

## III. CONCLUSION

The judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

MANION, Circuit Judge, dissenting.

I respectfully dissent. *United States v. James,* 478 U.S. 597, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986), is a broad opinion with harsh consequences that only Congress can address. Our previous attempt to decipher the limits of that opinion is no help in this case. In *Fryman v. United States,* 901 F.2d 79 (7th Cir.1990), we held that the government was necessarily immune, because the injury happened in flood control waters, and was the result of flood control activities. Surely, the broad scope of *James* applies in those circumstances.

Here, we know that the injury occurred in flood control waters. The court is correct that we do not know if the injuries resulted from flood control activities, but there is no need to remand for an evidentiary hearing to find out. Because the injury occurred in flood control waters, the broad scope of *James* compels the conclusion that the government was immune from suit.[1]

---

7. Of course, it is Bailey's burden to establish that the court has subject matter jurisdiction. *Selcke v. New England Ins. Co.,* 2 F.3d 790, 792 (7th Cir.1993); *see also Swain,* 825 F.Supp. at 973 (collecting cases). In another case, we likely would be inclined to affirm the dismissal of the suit in light of the plaintiff's failure to identify evidence of the kind that *Fryman* suggests might take the case beyond the scope of the government's immunity. But here, in moving for dismissal, the government argued in essence that any such evidence was irrelevant, and that *James* foreclosed whatever alternate standard *Fryman* might have envisioned:

> The relevant question should be whether the injuries were caused by the waters of a flood control lake. If they were, as in this case, immunity applies. A different result would be in conflict with the clear purpose of § 702c, as enunciated in *James*. For example, if a swimmer drowns trying to swim across a flood control lake, the purpose behind § 702c of limiting government liability would apply to bar a claim against the government regardless

of whether the drowning would have been just as likely in a natural lake devoted to recreational use. It is the presence of the project, not the causation of a particular accident, which is the determining factor.

R. 27 at 8. The district court agreed. Jan. 6, 1993 Order at 5–6. Thus, although Bailey expressly relied on *Fryman's* analysis in arguing that the court did have jurisdiction (R. 42 at 2–7) neither the government nor the district court ever addressed the question of whether the flood control features of Rend Lake increased the likelihood of Bailey's injury. Under these circumstances, we believe Bailey is entitled to the opportunity to address this question on remand.

1. This is not the type of case which we speculated about in *Fryman*—like a car falling through a pothole on the way to the beach—where the injury had nothing to do with the water. For such an out-of-water injury we questioned whether the broad scope of *James* would apply. Here, however, Bailey was injured when he jumped from a tree stump partially submerged in the flood-control water.