Donald CANTRELL; Dorla Cantrell, his wife, Plaintiffs–Appellants,

v.

UNITED STATES of America, DEPARTMENT OF the ARMY CORPS OF ENGINEERS, Defendant–Appellee.

No. 95–5895.

United States Court of Appeals,
Sixth Circuit.

Argued June 13, 1996.

Decided July 10, 1996.

Pierre M. de Bourbon (argued and briefed), Pruitt & de Bourbon, Pikeville, KY, for Plaintiff-Appellant Donald Cantrell.

Pierre M. de Bourbon, Bobby Ricky King, Pruitt & de Bourbon, Pikeville, KY, for Plantiff-Appellant Dorla Cantrell.

Dell W. Littrell, Asst. U.S. Attorney (argued and briefed), Lexington, KY, for Defendant-Appellee.

Before: WELLFORD, BOGGS, and COLE, Circuit Judges.

BOGGS, Circuit Judge.

██ Citing an immunity clause in the Flood Control Act of 1938, the district court granted the United States summary judgment on Donald Cantrell's suit against it for injuries sustained in the crash of an Army Corps of Engineers boat. We reverse, holding that the Flood Control Act does not protect the government from a claim of negligence, even one arising from an accident on a lake used as a flood control reservoir, unless an act constituting part or all of the alleged breach of the duty of care was an act undertaken to control flooding.

I

The United States Army Corp of Engineers (the Corps) uses Fishtrap Lake in Pike County, Kentucky, as a flood control reservoir. Each September, the Corps lowers the water level of the lake by about thirty-two feet so that the lake will be able to store runoff from winter storms. The process of winter "drawdown" causes considerable changes in the size, depth, and navigability of the lake. The surface area decreases by twenty percent (1131 acres to 906 acres), the shoreline changes, and features of the lakebed hidden in the depths during the summer emerge or lurk just below the surface. The pace of the drawdown is slow; the lake's level falls by about four inches per day over a three-month period.

Donald Cantrell went fishing on the lake on October 25, 1992. His boat malfunctioned, and Cantrell ended up stranded on an

isolated shore. When Cantrell did not return by nightfall, members of the Corps went searching for him. They found him walking along the shoreline, picked him up, and proceeded to make their way back to the marina. It was dark, there was no moon, vapor had condensed on the windows of the boat, and the usual channels across the lake were narrowed by the winter drawdown. (The water table at the time of the accident was thirteen feet below the summer table.) The boat struck part of the newly-exposed shoreline and sank. Cantrell was trapped in the cabin of the boat and sustained serious injuries.

After unsuccessfully seeking administrative remedies, Cantrell sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671. The United States raised several defenses in its answer. After brief discovery, the United States filed a "Motion for Summary Judgement or in the Alternative, Motion to Dismiss" on February 13, 1995. The motion claimed that Cantrell's action was barred by the immunity clause of the Flood Control Act of 1938, 33 U.S.C. § 702c ("No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."). Cantrell responded by arguing that his injuries were caused by the negligence of the driver of the government's boat, not by the government's flood control activities, and therefore were actionable under the general principles of the Federal Tort Claims Act.

The district court granted the government's motion. It held that the Act prohibited recovery because the part of the shore that the boat hit would have been safely submerged in the summer. That fact, which Cantrell conceded, meant that the winter drawdown was a "but for" cause of the accident, and that Cantrell could not recover. Memorandum Opinion and Order, March 21, 1995, at 43–44. Cantrell moved for reconsideration, arguing that the Corps's negligent driving had nothing to do with flood control activities, and that any role that the lake level played in his accident was unimportant, in light of the "intervening negligence" of the boat's driver. The court denied the motion

for reconsideration, Order, May 3, 1995, and Cantrell filed a timely notice of appeal.

## II

The Flood Control Act of 1938, 33 U.S.C. § 702c, provides that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." The Supreme Court in *United States v. James*, 478 U.S. 597, 610, 106 S.Ct. 3116, 3123–24, 92 L.Ed.2d 483 (1986), interpreted the immunity provision of the Act to cover personal injury claims by people using "flood waters" (or bodies of water used for flood control purposes) for recreation. *Ibid.* In *James*, swimmers and boaters were caught in currents caused by release of water from reservoirs. The plaintiffs sued on the theory that the government was negligent in draining the lakes, and negligent in failing to warn recreational users of the dangerous, hidden currents caused by flood control activities. The Court held that these acts of negligence, including the negligent failure to warn, were "part of the 'management' of a flood control project," *James*, 478 U.S. at 609–10, 106 S.Ct. at 3123–24, and could themselves not be a basis for tort liability. *Ibid.*

The court below cited *James*, 478 U.S. at 605 n. 7, 106 S.Ct. at 3121 n. 7, for the proposition that a "but for" nexus between flood control activity and a plaintiff's injury is sufficient to render the government immune. The court then found:

The object which the COE [Corps] boat struck ... would not have been exposed "but for" the release of water from Fishtrap Lake as a part of its annual winter drawdown.

Memorandum Opinion and Order, March 21, 1995, at 2. However, *James* does not mention a "but for" test. The footnote in *James* that the district court cites describes two appellate court cases, *Morici Corp. v. United States*, 681 F.2d 645, 647–48 (9th Cir.1982), and *Hayes v. United States*, 585 F.2d 701, 702–03 (4th Cir.1978). These cases merely hold that immunity applies when injuries "result from" or are "related to" flood control activity—they do not define the requisite causal relationship in precise terms.

Since *James,* many appellate courts have addressed the relationship between flood control activity and a plaintiff's injury that is necessary to allow the government to invoke the immunity provision of the Act. The Ninth Circuit has taken the simplest approach. In *McCarthy v. United States,* 850 F.2d 558 (1987), the Ninth Circuit held that a court has subject matter jurisdiction over a tort claim against the government only if a plaintiff's injuries are "wholly unrelated" to flood control activities. If the accident had *anything* to do with a flood control lake, or the management of a flood control lake, then the plaintiffs cannot sue. If faced with our case, the Ninth Circuit probably would note that Fishtrap Lake is used for flood control and affirm the dismissal without further inquiry. *See McCarthy,* 850 F.2d at 562 (1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989) (distinguishing *Graci v. United States,* 456 F.2d 20 (5th Cir.1971) (body of water a "navigation project" rather than a "flood control project")).

Other circuits recognize that such a sweeping grant of immunity makes little sense in light of the text and purpose of the Act. Judge Easterbrook on the Seventh Circuit writes:

> *James* was *so* broadly written that it cannot be applied literally. The "management of a flood control project" includes building roads to reach the beaches and hiring staff to run the project. If the Corps of Engineers should allow a walrus-sized pothole to swallow tourists' cars on the way to the beach, or if a tree-trimer's car should careen through some picnickers, these injuries would be "associated with" flood control. They would occur within the boundaries of the project, and but for the effort to curtail flooding the injuries would not have happened. Yet they would have nothing to do with management of flood waters, and it is hard to conceive that they are "damage from or by floods or flood waters" within the scope of § 702c.

*Fryman v. United States,* 901 F.2d 79, 81 (7th Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990) ("If § 702c has limits, they have to do with causation.").

In struggling to draw an appropriate line, some courts have followed the shoreline, extending immunity to the government whenever an accident occurs *on* flood control water. The analysis of the district court in *Cox v. United States,* 827 F.Supp. 378 (N.D.W.Va. 1992), is illustrative of a common attitude after *Fryman* (perhaps a result of the terrestrial nature of Judge Easterbrook's hypothetical torts). In *Cox,* a young girl was playing on a rope swing tied to a tree near a lake used for flood control purposes in a federal park. The girl swung out on the rope, but fell and hurt herself. When she sued the government for damage, the court allowed her action because she fell just short of the water, injuring herself on the rocky shore. *Id.* at 382.

Obviously, there may be accidents on the water that have as little to do with flood control activity as some acts on the shore (and acts on the shore that have as much to do with flood control activity as some acts in the middle of the lake). If a waterskiier is decapitated by a low-flying government pontoon plane, the injuries sustained could not possibly be damage from "flood waters." This would be true even if the lake across which the unfortunate skiier was speeding had been created by the government, from scratch, in order to serve as a reservoir for flood waters. In other words, there would be no meaningful causal nexus between the accident and flood control activity even if the accident was "related" to a flood control project, and even if the construction of the reservoir was a "but for" cause of the injury.

In interpreting the type of causal nexus necessary for immunity under the Act, the common law provides guidance. Generally, an act is not a legally sufficient cause of an injury unless it is both an actual *and a proximate* cause of that injury. The facts of this case show the difference between the two types of causation. The accident would not have occurred *but for* the drawdown. In one sense, therefore, the drawdown caused the accident. But this type of causation, standing alone, is legally meaningless, for it points the finger of blame everywhere and nowhere. The accident would not have occurred *but for* the moonless night, *but for* the

mechanical failure on Cantrell's boat, *but for* Cantrell's decision to go fishing, *but for* his boss's decision to give him the day off, *ad infinitum.* Every accident has countless *but for* causes—and it is a court's obligation when faced with questions of causation to weigh the *significance* of a proposed cause.[1]

In an effort to find a principled place to draw a line between significant and insignificant causal relationships, circuit courts have proposed a bewildering variety of linguistic tests. *Dawson v. United States,* 894 F.2d 70, 73–74 (3d Cir.1990) (immunity whenever flood control activities increased the likelihood of the plaintiff's injury); *Boudreau v. United States,* 53 F.3d 81, 85 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996) (same) (dictum contrary to *Mocklin v. Orleans Levee Dist.,* 877 F.2d 427, 430 (5th Cir.1989) (government protected from liability for any injuries on bodies of water related to a flood control project)); *Bailey v. United States,* 35 F.3d 1118, 1123–24 (7th Cir.1994) (citing *Fryman,* 901 F.2d at 81–82) (immunity when characteristics of the lake related to flood control increased the likelihood of the plaintiff's injury); *Dewitt Bank & Trust Co. v. United States,* 878 F.2d 246, 247 (8th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 493 (1990) (immunity when flood control activity was a "substantial factor" in the plaintiff's injuries); *Boyd v. United States,* 881 F.2d 895, 900 (10th Cir.1989) (immunity when injuries result from management choices relating to flood control, not management choices related to recreational activity).

Looking at the nature of the particular cases, rather than the phrasing of the various standards, there does seem to be a clear category of cases in which immunity does

apply, and a clear category of cases in which immunity does not. In fact, the differences between the circuits have more to do with the facts of the particular cases that the circuit courts have heard than with a dispute about the meaning of § 702c. In most cases, *James* being typical, the plaintiff is a diver, swimmer, or boater who sues the government for negligently conducting flood control activities, or for negligently failing to warn people about flood control activities. In these cases, the plaintiffs—who are trying to make the government pay for its flood control policy choices—invariably lose. *E.g., Boudreau,* 53 F.3d at 86 (boat capsizes after anchor catches on submerged trees); *Fisher v. United States,* 31 F.3d 683, 684 (8th Cir. 1994) (swimmer strikes submerged object); *Fryman,* 901 F.2d at 79 (same); *Zavadil v. United States,* 908 F.2d 334 (8th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991) (same); *Dewitt Bank,* 878 F.2d at 246 (same).

When the plaintiffs' allegation of wrongdoing centers on a government act that has nothing to do with flood control (regardless of the type of lake where that act takes place), the plaintiff sometimes survives a motion to dismiss under § 702c. Examples include *Boyd,* 881 F.2d at 900 (plaintiff alleges that government negligently allowed speedboats on the lake, without first warning swimmers), and *Cox,* 827 F.Supp. 378 (N.D.W.Va.1992) (plaintiff alleges that Corps of Engineers negligently allowed children to use a dangerous rope swing near flood control lake). The circuit courts with the toughest-sounding tests, like the Ninth Circuit, report no cases where the plaintiff's theory of liability did not involve a challenge to the

---

**1.** The district court's use of the lake level as a "but for" cause of the accident is problematic for another reason. At the time of the accident, the lake was thirteen feet below summer pool (average water level during the summer). The court found that the government's flood control activity therefore exposed the top of the relevant rock, and made the lake unreasonably dangerous. Logically, this is nonsense. The lake is only at summer pool for a quarter of the year. It spends an equal amount of time at winter pool. At the time of the accident, the lake was eighteen feet *above* winter pool. One could just as well say that the government's flood control activity cov-

ered up most of the rocky shore, and made the lake unusually safe for boating. There is no indication in the record that any particular lake level is more "normal" than another—and the "but for" test may therefore depend on whether one views the lake as half empty or half full.

At oral argument, the government conceded that the district court was incorrect to focus on the level of the lake. The government contends that the causal significance of the government's flood control activity must be confined to the fact that the water level *changes*—making navigation more difficult because the lake is unpredictable.

government's flood control activities or the government's decisions about how to maintain flood control waters.

If Cantrell had been driving the boat, we would affirm the grant of summary judgment for the government without much hesitation. The nature of Cantrell's injuries would not change—nor would the effect, if any, that the lake level had the likelihood of an accident. What would change is the type of government wrongdoing that Cantrell could allege. If he were driving, Cantrell could only claim that the government negligently dropped the water level, or that the government failed to tell him about how dangerous the water level was, or that the government failed to take steps to make it easy for people to navigate at low water levels. These are all challenges to government decisions directly related to flood control operations at Fishtrap Lake. *James*, 478 U.S. at 610, 106 S.Ct. at 3123–24 ("manner in which to convey warnings ... is part of the 'management' of a flood control project"). The imposition of liability on one of these theories would say to the government: "if you are going to change the water level here, you must do X, and post X, and have X safety plan."

In contrast, Cantrell seeks relief solely on the theory that the driver of the Corps boat was negligent. He does not allege that the drawdown was unreasonable, that the water level was dangerous, or that the government had a duty to make navigation easy. In its pleadings and appellate briefs, the Corps implies that the low water level made navigation almost impossible—and that the drawdown was therefore the primary cause of the accident. United States Br. at 19. As a factual matter, this allegation may or may not be true. But the allegation is only important as a defense *on the merits* to the claim that the pilot was negligent (if all pilots would have crashed, this pilot cannot be blamed for crashing). The allegation is irrelevant to the threshold legal question of whether, in this particular case, Cantrell is trying to recover from the Corps for injuries caused by government flood control activity. Cantrell is clearly not challenging flood control decisions, as his counsel repeatedly stressed at oral argument. He has only one theory of liability: the pilot's negligence. Since the pilot's negligence was not part of government activity to control floods or flood waters, the immunity clause of the Flood Control Act is irrelevant to Cantrell's claim. *See Hayes v. United States*, 585 F.2d 701, 702–03 (4th Cir.1978) ("If the plaintiff could prove damage to his farm as a result of the dam's operation as a recreational facility without relation to the operation of the dam as a flood control project, he would avoid the absolute bar of § 702c.") (cited in *James*, 478 U.S. at 605 n. 7, 106 S.Ct. at 3121 n. 7).

█ We realize that in deciding this case, we analyze the problem before us in a different manner than other appellate courts have in the past. Instead of focusing on the injury (or its location), we focus on the particular tortious act for which the plaintiff is trying to hold the government liable. We believe that this approach makes sense in light of the scattered precedent concerning such accidents; indeed, we have found no case whose facts and ultimate holding may not be reconciled with our method. We also believe that the focus on the allegedly tortious act is the only way to reconcile the Flood Control Act with the general principles of governmental responsibility embodied in the Federal Tort Claims Act.[2]

We therefore remand. A question remains as to the standard that the district court (and district courts generally) should use to decide if the facts, once they are more fully developed, warrant dismissal under the Act. One option comes from the Seventh Circuit: the district court should dismiss as soon as it determines that the lake's characteristics as a flood control lake made the particular injury more likely to occur. *Bailey*, 35 F.3d at 1123–24. An obvious improvement over the

---

**2.** *James* used exactly the same method. The plaintiffs argued that the government could be held liable because the tortious act was "wholly unrelated" to flood control activity. The court rejected this position by pointing out that the tortious act was indeed "part of" the management of a flood control project. Nowhere in *James* does the court say that a "but for" or "cause in fact" nexus between the injury and the existence or character of flood water is sufficient to render the government immune.

"but for" thinking of other circuits, the Seventh Circuit's test, perhaps because it focuses on the injury rather than the challenged government act, still appears too malleable to be meaningful in an actual case. One certainly *feels* that Judge Easterbrook is correct to state the government should be liable for walrus-size potholes left on an access road to a flood control lake. But how can this situation be explained by the legal standard adopted in *Fryman* and *Bailey?* What if the chance of negligently leaving a pothole was greater because thousands of heavy trucks use the road to haul dirt to make a levee to build up a lake? Under the Seventh Circuit's test, the government's potholing would now appear to be privileged—not because any particular failure to repair is somehow less negligent or more related to flood control activity, but simply because flood control activity makes the chance of government misdeed more predictable or recurrent.

We believe that the proper standard on summary judgement is whether the plaintiff can recover without holding the government liable for a privileged activity—i.e., an activity (or a physical phenomenon caused by an activity) somehow necessary in the government's battle to control floods. In this case, for example, if Cantrell can recover purely based on the driver's negligence (suppose the driver were drunk), then the Flood Control Act is of no consequence to the action. However, if the facts of the case show that the boat's driver was not negligent, but was operating his craft in a reasonable manner given the dangerous water level of the lake, then Cantrell must lose. If uncontested facts show either that the lake was exceptionally dangerous such that it is probable that any reasonable driver would have crashed, or that the Corps driver was driving reasonably, the court should grant summary judgment for the Corps. If there is a genuine issue about whether the driver was negligent, however, then Cantrell should get a chance to prove his case at trial. If the facts at trial

show that the lake, and not the driver, is to blame, then the court should enter judgment in favor of the Corps. In no event may Cantrell hold the government liable for flood control activity or, what is the same thing according to *James,* the dangerous physical condition of a flood control lake.[3]

One might object that our focus on the causal facts of the accident may let the jury hear cases that otherwise would be summarily dismissed. This is of little concern. First, a claim of injury from a negligent act that has nothing to do with flood control *should* survive summary judgment if there is a genuine issue of material fact as to whether the negligent act proximately caused the injury. Second, there is no risk of a jury confusing the issues, ignoring a cautionary instruction, and holding the government liable for "flood control activity" under the guise of holding it liable for non-privileged negligence (e.g., boat driving). The trier of fact in a FTCA suit is a judge, *Carlson v. Green,* 446 U.S. 14, 22, 100 S.Ct. 1468, 1473–74, 64 L.Ed.2d 15 (1980) (no right to jury trial under FTCA)—usually the same judge who would have decided a motion for summary judgment.

### III

For all these reasons, we think that the wise course is to hold that the Flood Control Act does not apply at this stage, and to let general FTCA doctrine resolve Cantrell's claim that the Corps pilot negligently crashed the rescue boat. Even in environments made more dangerous by flood control activity, the United States is liable under the FTCA for negligent *acts* unrelated to efforts to control floods or to maintain flood control waters. The judgment is **REVERSED,** and the case **REMANDED** for further proceedings in light of this opinion.

---

**3.** Looking at existing precedent, we note that "dangerous condition of the lake" encompasses both the changing nature of the water level and the presence or absence of relevant warning signs. We also note, because we can imagine such questions arising, that an act is not excluded from the scope of privileged "flood control activity" simply because it is done in a negligent

manner. If the Corps engineer running a sluice gate was drunk on duty, for example, his operation of the sluice gate would still be "flood control activity." What is important is the generic type of activity being challenged (changing the water level versus driving a boat), and whether that type of activity is an integral part of the government's flood control efforts.